# EXHIBIT A

NEVADA COUNTY
STATE OF CALIFORNIA
-------------------------------------------------------------------X

In the Matter of the Application of:

**SEQUOIA DEPLOYMENT SERVICES INC.**

Application for Conditional Use Permit              **MEMORANDUM IN**
Premises:        20896 Dog Bar Road,               **SUPPORT OF APPEAL**
                 Grass Valley, CA 95949


Permit No.:      CUP23-0015
A.P.N:           027-010-018
-------------------------------------------------------------------X


**MEMORANDUM IN
SUPPORT OF APPEAL**


Respectfully Submitted,


Jeffrey and Kristin Phalen, 13106 Amber Street, Grass Valley, California 95949
Bruce Roush, 20791 Dog Bar Road, Grass Valley, California 95949
Janet Brisson, 20693 Dog Bar Road, Grass Valley, California 95949
Gregory, Linnie, and Laura McNaughton, 21055 Dog Bar Road, Grass Valley, California 95949
Kienan Parr, 21055 Dog Bar Road, Grass Valley, California 95949
Jerry and Ashley Permenter 20962 Dog Bar Road, Grass Valley, California 95949
Mr. and Mrs. Krecek, 20962 Dog Bar Road, Grass Valley, California 95949
Sandy Mallory, 12950 Amber Street, Grass Valley, California 95949
Max and Lisa Krewson, 20915 Hickman Pass Road, Grass Valley, California 95949
Doug and Jill Boan, 21038 Hickman Pass Road, Grass Valley, California 95949

Table of Contents

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**POINT I**     Nevada County's Zoning Authority Under The Telecommunications
Act of 1996 and Nevada County Code Sec L-II 3.8 . . . . . . . . . . . . . . . . . . . . . . 3

**POINT II**    *Sequoia* and *Verizon* Have Failed to Submit Any Probative Evidence
Whatsoever to Establish Any Actual Need for the Proposed Facility . . . . . . . . . . . 5

      A.    Basic Evidence of Need for a New Cell Tower . . . . . . . . . . . . . . . . . . . . . . 6

      B.    *Verizon's* Actual Coverage Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      C.    Lack of Hard Data From *Sequoia*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      D.    The FCC's Rejection of Computer-Generated "Propagation Maps". . . . . . 9

      E.    Lack of Data For *Verizon's* Other Frequencies . . . . . . . . . . . . . . . . . . . . . 10

      F.    The "Coverage Maps" Provided by *Sequoia* are
Inherently Void of Probative Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**POINT III**   Granting *Sequoia* Permission to Construct a 129-Foot Cell
Tower at the Proposed Location Would Violate Both the
Requirements Of the Code and the Legislative Intent
Based Upon Which Those Requirements Were Enacted . . . . . . . . . . . . . . . . . . . . 13

      A.    Granting *Sequoia's* Application Would Violate
Section L-II 3.8 of the Code, and *Sequoia* Has Failed to
Establish Grounds upon Which a Conditional Use
Permit Could be Granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      B.    The Proposed Thirteen-Story Cell Tower Will Inflict
Substantial, Albeit Wholly Unnecessary, Adverse Aesthetic
Impacts Upon Nearby Homes and Surrounding Area . . . . . . . . . . . . . . . . . 15

      C.    *Sequoia*'s Visual Impact Images are Inherently Defective
and Should be Disregarded Entirely . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

D.      The Proposed Installation Will Inflict Substantial and
        Wholly Unnecessary Losses in the Values of Adjacent
        and Nearby Residential Properties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

E.      The Proposed Siting Lacks a Sufficient Fall Zone
        and Would Subject the Adjacent Properties to the
        Dangers of Structural Failures and Fire . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        (i)      Structural Failures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

        (ii)     Fires . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**POINT IV**    §6409(a) of the Middle-Class Tax Relief and Job Creation Act
                of 2012 Would Allow *Sequoia* to Increase the Height of the Facility
                Without Further Zoning Approval . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**POINT V**     To Comply With the TCA, *Sequoia*'s Application Should Be Denied
                In A Written Decision Which Cites the Evidence Provided Herein . . . . . . . . . . . . 28

        A.      The Written Decision Requirement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        B.      The Substantial Evidence Requirement. . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        C.      The Non-Risks of Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**<u>Preliminary Statement</u>**

This Memorandum is submitted in support of an appeal of the granting of an application of a real estate services company, *Sequoia Development Services Inc.,* to obtain a Conditional Use Permit to erect a thirteen (13) story cell tower in an area in Nevada County where no other structure stands more than two (2) stories in height.

The installation of such a large tower at such a proposed location would not only *stick out like a sore thumb* in the surrounding community, it would inflict upon the nearby homes and surrounding community the precise types of adverse impacts that the relevant provisions of The Land Use and Development Code of Ordinances of the County of Nevada, California (hereinafter "the Code"), were enacted to prevent.

It is important first to note that the company seeking the permit to build this thirteen (13) story tower, *Sequoia Development Services Inc. (hereinafter "Sequoia")*, is not a *wireless carrier.*

*Sequoia* does not need the proposed tower to provide any personal wireless services within Nevada County or anywhere else because it does not provide personal wireless services.[1]

*Sequoia* is a for-profit "*real estate services company"* that finds locations where cell towers can be built and then acts as a real estate agent for actual wireless carriers.[2]

---

[1] As reflected on its internet web pages, Sequoia Deployment Services Inc. is a real estate services company specializing in "site acquisition services." – *See* Exhibit "A."
[2] *See* Exhibit "B."

1

In support of their current application, neither *Sequoia* nor *Verizon* has provided a shred of probative evidence that there is any actual current need for *Sequoia's* proposed thirteen (13) story tower or that the residents of Nevada County will derive any benefit whatsoever if it is installed.

It is respectfully submitted by the multiple homeowners whose homes are situated in close proximity to the site for the proposed cell tower that the decision to grant *Sequoia's* application should be overturned because, among other things:

(a)     Granting *Sequoia's* application would not only violate the applicable provisions of the Code but would be contrary to the explicitly stated legislative intent for which the County enacted such provisions;

(b)     The installation of such a large tower will inflict wholly unnecessary, albeit substantial, adverse impacts upon the nearby homes and surrounding community around the facility;

(c)     The irresponsible placement of the thirteen-story cell tower at the proposed location would inflict wholly unnecessary adverse aesthetic impacts upon the nearby and surrounding homes and would reduce the property values of same;

(d)     *Sequoia* has failed to provide any probative evidence whatsoever that its proposed thirteen-story tower is actually necessary for *Verizon* to provide personal wireless services within the County, or that residents of the County would derive any benefit, whatsoever, therefrom; and

(e)     *Sequoia* has wholly failed to establish that whatever need might exist for a new tower, could not be remedied by the installation of a tower at a less intrusive alternative site, or with a shorter cell tower.

2

Accordingly, it is respectfully requested that this appeal of *Sequoia*'s application be granted and that *Sequoia's* application be denied in a manner that complies with the procedural requirement for such a denial mandated under the Telecommunications Act of 1996.

## POINT I

### Nevada County's Zoning Authority Under The Telecommunications Act of 1996 and Nevada County Code Sec L-II 3.8

When Congress enacted the Telecommunications Act of 1996, it explicitly preserved for state and local governments, including Nevada County, the general authority to regulate cell tower siting, construction, and maintenance within their respective jurisdictions.[3]

Armed with such authority, local governments, including Nevada County, have been enacting and applying what are known as "*smart planning provisions*" since 1996.

---

[3] *See* The Telecommunications Act of 1996, 47 USCA §332(c)(7), which provides:

   "**(7)    PRESERVATION OF LOCAL ZONING AUTHORITY**

   (A)    General authority
           Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities."

3

*Smart planning provisions* are local code provisions that are designed to achieve three simultaneous objectives, which include (a) enabling wireless carriers to saturate jurisdictions with wireless coverage so their citizens can enjoy personal wireless services, while (b) minimizing the number of cell towers needed to provide those services, and (c) avoiding, to the greatest extent feasible, any unnecessary adverse impacts to residential homes and/or communities due to the irresponsible placement of cell towers.

Nevada County has enacted a smart planning provision encompassed within Sec. L-II 3.8 of the Code, which includes provisions clearly intended to achieve those three specific objectives.

*First*, Section Sec. L-II 3.8 D(1) explicitly mandates that:

> "All land use applications for new communications towers shall include the following information:
>
> 1. Detailed information to justify the need for the proposed tower."

*Second*, Section Sec. L-II 3.8 E(1) explicitly requires that:

> "1. Communication towers shall be located to minimize their visibility and the number of distinct facilities present."

Consistent with local zoning codes across the United States, the language within L-II 3.8, which requires towers to be "located" *(i.e., sited)* to "minimize" "**the number of distinct facilities," means that it requires cell towers to be strategically placed to minimize the number** needed to saturate the County with personal wireless coverage.

To enable the County to determine whether a proposed new facility would be consistent with that objective, section 3.8 D(1) contemporaneously requires any applicant to provide "detailed information to justify the need for the proposed tower."

4

As set forth herein below, neither the applicant *Sequoia* nor Verizon has provided a shred of probative evidence to establish that their proposed installation meets either of those requirements or the objectives that their inclusion into Sec L-II 3.8 was intended to achieve.

Moreover, the Code's requirement that cell towers be "located" (i.e., sited) to "minimize" their "visibility" is clearly intended to require towers to be strategically sited to avoid inflicting unnecessary adverse aesthetic impacts upon nearby properties and surrounding communities.

This is entirely consistent with Sec. L-II 3.8(A), which explicitly states that the purpose of Sec. L-II 3.8 is, among other things, to ensure that cell towers are required to be sited strategically to ensure their "compatibility with adjacent land uses." It is also consistent with Chapter 18 of the Nevada County General Plan, which is devoted entirely to protecting the "aesthetic quality" of Nevada County.

As also set forth herein below, neither *Sequoia* nor *Verizon* has provided credible evidence that their proposed installation meets this requirement, and in fact, the visual impact submissions they have proffered to the County are inherently defective, <u>as a matter of law</u>.

## POINT II

*Sequoia* and *Verizon* Have Failed to Submit Any
Probative Evidence Whatsoever to Establish
<u>Any Actual Need for the Proposed Facility</u>

Glaringly absent from *Sequoia's* application and its submissions in support of same is anything that even remotely establishes that its proposed massive steel tower is needed or that the residents of Nevada County will derive any benefit from its installation.

A.     <u>Basic Evidence of Need for a New Cell Tower</u>

Where a *wireless carrier* is possessed of a genuine need for a new cell tower to remedy a significant gap in its personal wireless service, it will generally approach the local municipality and do two things.

First, the carrier will tell the local officials - based on the County's physical topography - what level of signal strength they need to provide reliable wireless service within the County.[4]

Second, it will perform a "drive test" to determine the actual signal strengths that exist throughout the County and provide the County with the "hard data," that is, the actual recorded signal strengths that exist throughout the County.

That data invariably shows (a) the existence of any significant gaps in any specific carrier's wireless service, (b) the *location* of any such gaps in service, and (c) *the geographic boundaries* of any such gaps.

If, and only if, a local government receives that hard data from an applicant, is the local government placed into a position where it can make an informed decision as to whether or not the proposed siting for the new cell tower would be consistent with smart planning, and would avoid any unnecessary redundancy in wireless infrastructure within the municipality.

By contrast, where, as here, a site acquisition agent files an application to install a new cell tower that is not actually currently needed, they will try to assert a claim of "need" based upon "propagation maps," which they obtain from someone who simply creates them using their desktop computer.

---

[4] By way of example, the carrier might say, due to your mountainous (or flat) terrain, we need a minimum signal strength of *-98dbm* to maintain reliable personal wireless service in your area.

Those purported "coverage maps" are submitted with no actual supporting data whatsoever, while the site acquisition agent submits them as the purported evidence of the need for a new cell tower, where no such actual need currently exists.

This is precisely the case here.

In support of its application, *Sequoia* has not provided any probative data or actual evidence that *Verizon* actually "needs" the proposed thirteen-story tower *Sequoia* seeks to build.

Instead, *Sequoia* has asserted, without any supporting data, whatsoever, that:

> *"Verizon has identified a significant gap in its Long Term Evolution wireless service in the south eastern area of Nevada County."*

*See* Exhibit "C" – page 8 of the ZA Staff Report, in the second paragraph entitled "Site Justification" - articulating the alleged basis of need proffered by *Sequoia* in support of its application.

That letter is accompanied by what can be best described as utterly *nonsensical* "coverage maps," which are inherently void of probative value and serve as evidence of virtually nothing. Copies of the purported "coverage maps" submitted by *Sequoia* are annexed hereto as Exhibit "D."

As explicitly detailed herein below, not only are the "coverage maps" submitted by *Sequoia defective beyond justification,* but ***Verizon's* own** actual coverage maps show that the maps provided by *Sequoia* are utterly baseless.

7

B.    *Verizon's* Actual Coverage Data

When faced with clearly defective submissions such as that which has been submitted by *Sequoia* herein, sophisticated local governments typically first access *Verizon's* own publicly accessible database in an effort to confirm the existence or absence of coverage gaps that might necessitate the installation of a new tower being proposed by the site acquisition agent.

As is a matter of public knowledge, *Verizon* maintains a database of its wireless coverage information, which can be publicly accessed through *Verizon's* interactive website, which is linked to its coverage database.

According to *Verizon's* own coverage database, *Verizon* has no significant gaps in its 4GLTE wireless coverage at the precise location where *Sequoia* is seeking to build its proposed thirteen-story tower.

Annexed hereto as Exhibit "E" is an actual printout of *Verizon's* coverage map, which reflects *its actual* wireless coverage at 20896 Dog Bar Road, Grass Valley, California, 95949 - - that being the precise location at which *Sequoia* seeks to build its proposed tower - - and the map is current as of June 22, 2024.

As reflected on *Verizon's* own coverage map, *Verizon* has no gaps in either its 5G or 4GLTE wireless coverage at, or anywhere near, the precise location where *Sequoia* seeks to build its proposed tower. As reflected on the key code from *Verizon's* wireless coverage map (Exhibit "E"), "gaps" in *Verizon's* wireless coverage are depicted by areas that are white, and the map reflects that there are no white areas at, or anywhere near, the location where *Sequoia* proposes to build its desired tower.

8

C.    Lack of Hard Data From *Sequoia*

Not surprisingly, glaringly absent from *Sequoia's* submissions is any "hard data," which could have been submitted by *Sequoia* as probative evidence to establish that, contrary to what *Verizon's* own coverage maps show, that there is actually a "significant gap" in *Verizon's* wireless service, which necessitates the installation of the new facility, and which requires it to be built at the proposed location (as opposed to being built upon alternative, less-intrusive locations).

But without any meaningful data whatsoever purporting to show the existence of any such alleged gap, the County cannot possibly find that *Sequoia*'s proposed thirteen-story tower is actually needed or if the proposed location would be the least intrusive means of providing personal wireless service to the community because they have no idea where any purported significant gaps are alleged to exist.

As anyone in the wireless industry would know, desktop computer-generated "coverage maps" such as those submitted by *Sequoia* are virtually meaningless and are routinely rejected as such by both the FCC and knowledgeable local governments across the United States.

D.    The FCC's Rejection of Computer-
Generated Propagation Maps

Both the FCC and local governments nationwide have rejected the precise type of submission that *Sequoia* has submitted to the County because they recognize the absolute need for hard data rather than desktop-generated propagation maps, which are very often manipulated to exaggerate need and significant gaps.

9

By 2019, the FCC staff became so frustrated by the wireless industry's submission of patently false computer-generated coverage maps that the FCC proceeded to conduct a "COVERAGE MAPS INVESTIGATION" to test the accuracy of the maps by conducting drive testing.

After performing 10,000 miles of drive testing, the FCC staff found that the accuracy of computer-generated coverage maps ranged from a high of 64.3% and a low of 16.2%, with *Verizon's* coverage maps being the lowest in accuracy level. See Exhibit "F" annexed hereto, the first two pages of the FCC Staff report, GN Docket # 19-367, second page, at paragraph 4.

Upon finding this, the FCC staff recommended that the FCC never accept computer-generated coverage maps from any wireless company unless the wireless company simultaneously provided *actual drive test data* to substantiate what its propagation maps purportedly showed.

Since the FCC staff does not accept computer-generated coverage maps *without supporting hard data*, neither should Nevada County.

### E.     Lack of Data For *Verizon's* Other Frequencies

But even if one were to assume that the "coverage maps" submitted by *Sequoia somehow* accurately depicted *Verizon's* wireless coverage signal strength on **_one_** of the frequencies at which *Verizon* provides personal wireless service to its customers, the maps still prove virtually nothing because they still do not disclose *Verizon's* coverage on eleven (11) out of the twelve (12) frequencies at which *Verizon* provides personal wireless service to its end-use customers.

As a federal Court recently held in <u>ExteNet Systems, Inc. v. Village of Flower Hill</u>, No. 19-CV-5588-FB-VMS (E.D.N.Y. July 29, 2022), if a site acquisition agent provides proof that *Verizon* has a gap in one of the frequencies at which it provides wireless services, that does not establish the existence of any actual gap in *Verizon's* wireless services, and it certainly does not establish a need to build a new cell tower.[5]

Here is why. *Verizon* simultaneously provides personal wireless services on twelve (12) different frequencies to enable customers to maintain calls on any available frequency.

So, if someone is on a cell phone call using *Verizon's* 5G or 4GLTE service as they drive through town, and they drive to a location where the signal strength for *Verizon's* 5G service drops too low to maintain the call, the user's cell phone will simply "*downshift*" to 4G, or 3G, or 1X, without the user's knowledge. They will simply continue on their call.

As such, the Court held in <u>Flower Hill's</u> case that to establish that an actual need for a new cell tower exists, a site developer is required to prove that *Verizon's* customers cannot use their phone to connect to a landline, using that carrier's service, *on **any** of the frequencies* through which the carrier provides such service.

As *Verizon* has disclosed publicly, it provides wireless service on twelve (12) different frequencies (*See* Exhibit "H" annexed hereto, on page 2) and the "maps" that have been provided to the County in support of *Sequoia's* application only purport to show before and after "coverage" on **one** out of those **twelve** frequencies.

---

[5] A courtesy copy of the Federal Court's decision in <u>ExteNet Systems Inc. v. Village of Flower Hill</u> is annexed hereto as Exhibit "G."

As such, *Sequoia* has failed to show that *Verizon* actually has any gap in its wireless service and that it has any current actual need to build the proposed thirteen-story tower where *Sequoia* proposes to build it.

Nor has *Sequoia* even remotely shown that denying its application to construct its desired tower would "materially inhibit" *Verizon*, or any other carrier, from competing to provide personal wireless services in a fair and balanced legal and regulatory environment.

        F.    The "Coverage Maps" Provided by *Sequoia*
                are Inherently Void of Probative Value

As for the single unspecified frequency which the "coverage maps" submitted by *Sequoia* are purported to show, the coverage maps that *Sequoia* has provided to the County are the precise types of desktop-created maps that the staff at the FCC has recommended that the FCC never accept, without hard drive test data to back them up, as a result of having found that these types of maps have no actual probative value, and do not establish coverage, or lack of coverage, in the geographic areas which are purportedly displayed in such maps.

As reported in the news in 2020, the wireless carriers opposed a mandate from the FCC staff that they do not submit these types of coverage maps to the FCC unless they provide actual drive test data to support them. See https://arstechnica.com/tech-policy/2020/08/att-t-mobile-fight-fcc-plan-to-test-whether-they-lie-about-cell-coverage/ *"AT&T, Sequoia fight speed tests that could prove their coverage maps wrong"* and "***Carriers oppose FCC drive-test mandate, despite history of exaggerating coverage***."

The FCC's distrust of computer-generated coverage maps grew so severe that in 2020, the FCC would only approve license transfers for the merger of two carriers upon the

condition that the carriers performed one million (1,000,000) miles of actual drive testing.

*See*, annexed hereto as Exhibit "I," a true copy of an excerpt of an FCC document wherein the carriers agreed to perform one million miles of actual drive testing.

As logic would dictate, the FCC did not require one million miles of drive testing to "waste gas." The FCC required it because it knows that computer-generated "propagation maps," such as those submitted to the County by *Sequoia*, are entirely unreliable and lacking in evidentiary value.

The FCC refuses to accept them as evidence of anything, and Nevada County should refuse to accept them for precisely the same reason.

## POINT III

Granting *Sequoia* Permission to Construct a 129-foot Cell
Tower at the Proposed Location Would Violate Both the
Requirements Of the Code and the Legislative Intent
Based Upon Which Those Requirements Were Enacted

   A.   Granting *Sequoia's* Application Would Violate
Section L-II 3.8 of the Code, and *Sequoia* Has
Failed to Establish Grounds upon Which a
Conditional Use Permit Could be Granted

*Sequoia* seeks to build its proposed thirteen (13) story metal tower in a residential neighborhood, unnecessarily close to multiple homes.

Applications for constructing Wireless Telecommunications Facilities, such as the cell tower that *Sequoia* seeks to build, are governed by Code Section Sec L-II 3.8.

As is set forth within Sec. L-II 3.8(A), the explicitly stated purpose for which that

13

section was enacted is to regulate the siting of wireless communications facilities to "ensure" that cell towers are sited where they will be compatible with adjacent land uses.

Under Sec L-II 3.8, applications for new cell towers cannot be granted unless the applicant provides proof that the proposed new cell tower is actually needed for a carrier to provide wireless services within the County[6] and that the proposed new tower will be sited to (a) minimize the number of towers necessary to provide wireless services within the County and (b) minimize its visibility.[7]

*Sequoia*'s application does not meet any of these three requirements because (1) *Sequoia* has not produced or submitted any evidence to show that (a) the proposed new cell tower is actually needed, (b) it needs to be built at a height of thirteen stories, (c) that its placement at the proposed site will reduce the number of towers needed within the County, and will avoid unnecessary redundancy in wireless infrastructure within the County, or (d) that it will be sited at a location with will minimize its visibility, and will be compatible with the use of adjacent properties, with the closest residence being located only 100 feet from the thirteen-story tower.

As set forth herein below, the irresponsible placement of such a massive tower at the location chosen by *Sequoia* will not be compatible with the uses of the adjacent properties but will instead inflict severe, albeit wholly unnecessary, impacts upon same.

Since granting the Conditional Use Permit to build it would not only violate the applicable provisions of the Code but would also inflict the precise types of adverse impacts the

---

[6] *See* Sec L-II 3.8(D)(1) which provides that:
    "All Land Use Applications for new communications towers **shall** include the following information: 1. Detailed information to justify the need for the proposed tower site."
[7] *See* Sec. L-II 3.8(E)(1), which provides: "Communications towers shall be located to minimize their visibility and the number of distinct facilities present."

Code was enacted to prevent, *Sequoia's* application should be denied as a matter of law.

        B.    The Proposed Thirteen-Story Cell Tower Will Inflict
Substantial, Albeit Wholly Unnecessary, Adverse Aesthetic
<u>Impacts Upon Nearby Homes and Surrounding Area</u>

Being proposed for installation in close proximity to several residential homes in an area where no other structures stand more than two stories in height and where no foliage would or could "camouflage" or "buffer" such a massive steel tower, it is beyond argument that the tower will not only stand out like a sore thumb, it will dominate the skyline in all directions, adversely impact the character of the neighborhood, and inflict dramatic adverse aesthetic impacts on the nearby homes.

 As logic would dictate, the persons who are best suited to assess the nature and extent of the adverse aesthetic impacts that an irresponsibly placed cell tower would inflict upon homes in close proximity are the homeowners themselves.

Consistent with this logic, federal courts have recognized that when a local government is considering a wireless facility application, it should accept statements and letters from the actual homeowners as direct evidence of the adverse aesthetic impacts that a proposed facility would inflict upon nearby homes since they are in the best position to know and understand the actual extent of the impact they stand to suffer. *See, e.g.,* <u>Omnipoint Communications Inc. v. The City of White Plains</u>, 430 F.3d 529 (2d Cir. 2005).

Annexed collectively hereto as Exhibit "J" are letters from homeowners whose homes are situated in close proximity to the site upon which *Sequoia* seeks to install its proposed cell tower.

Within each of these letters, the homeowners personally detail, from a first-hand perspective, the actual adverse aesthetic impacts that the proposed facility would inflict upon each of their respective homes. They have provided detailed and compelling descriptions of the dramatic adverse impacts their properties would suffer if the proposed installation of a wireless telecommunication facility were permitted to proceed.

These include letters from homeowners and residents: Kristin Phalen and Jeffrey Phalen, 13106 Amber Street, Grass Valley CA 95949; Ashley Permenter, 20962 Dog Bar Road, Grass Valley CA 95949; Bruce Roush, 20791 Dog Bar Road, Grass Valley CA 95949; Mike and Janet Brisson, 20693 Dog Bar Road, Grass Valley CA 95949; Dira Krecek, 20962 Dog Bar Road, Grass Valley CA 95949; Gregory McNaughton, Linnie McNaughton, Laura McNaughton and Kienan Parr, 21055 Dog Bar Road, Grass Valley CA 95949; and Sandra Mallory 950 Maidu Avenue, Nevada City CA 95959.

These letters convey first-person perspectives detailing the nature and extent of the adverse aesthetic impacts their respective homes will suffer if the installation of the proposed thirteen-story steel tower is permitted.

These specific and detailed impacts described by the adjacent and nearby property owners constitute "substantial evidence" of the adverse aesthetic impacts they stand to suffer because they are not limited to "generalized concerns" but constitute the precise types of adverse impacts based upon which local governments across the nation deny applications seeking approvals for the irresponsible placement of cell towers such as that being proposed by *Sequoia*.

16

These letters contain specific, detailed descriptions of how the proposed facility would dominate the views from within their homes, their living room, dining room, kitchen, and bedrooms, and virtually all perspectives of their properties. The adverse aesthetic impacts detailed in these letters are the precise type of damaging impacts that the applicable provisions of the Code were specifically enacted to prevent.

As has been consistently held by federal courts around the country, significant or unnecessary adverse aesthetic impacts are proper legal grounds upon which a local government may deny a zoning application seeking approval for the construction of a wireless telecommunication facility. *See, e.g.,* Sprint PCS Assets, L.L.C. v. City of Palos Verdes Ests., 583 F.3d 716 (9th Cir. 2009); *see also* GTE Mobilnet of Calif. Ltd. P'ship v. City of Berkley, supra ("Even under a substantial evidence review, zoning decisions based on aesthetic concerns can be valid," and "under the TCA, [a zoning board] is entitled to make an aesthetic judgment as long as the judgment is 'grounded in the specifics of the case,' and does not evince merely an aesthetic opposition to cell-phone towers in general." citations omitted); and New Cingular Wireless PCS, LLC v. County of Marin, Calif., 2021 WL 5407509, (N.D. Calif. 2021). "[T]he City may consider a number of factors including the height of the proposed tower, the proximity of the tower to residential structures, the nature of uses on adjacent and nearby properties, the surrounding topography, and the surrounding tree coverage and foliage. We, and other courts, have held that these are legitimate concerns for a locality." Sequoia USA, Inc. v. City of Anacortes, 572 F.3d 987, 994 (9th Cir. 2009); Sprint Telephony PCS, L.P. v. Cty. of San Diego, 543 F.3d 571, 580 (9th Cir. 2008) (stating that the zoning board may consider "other valid public goals such as safety and aesthetics"); Sequoia Cent., LLC v. Unified Gov't

17

of Wyandotte County, Kan., 546 F.3d 1299, 1312 (10th Cir.2008) (noting that "aesthetics can

be a valid ground for local zoning decisions"); and Cellular Tel. Co. v. Town of Oyster Bay,

166 F.3d 490, 494 (2d Cir.1999) (recognizing that "aesthetic concerns can be a valid basis for

zoning decisions").


C.    *Sequoia's* Visual Impact Images are Inherently
Defective and Should be Disregarded Entirely

In a hollow effort to induce the County to believe that the installation of a massive thirteen

(13) story cell tower *would not* inflict a severe adverse aesthetic impact upon the adjacent homes,

*Sequoia* has submitted purported photo simulations in the form of eight photographic images,

copies of which are annexed hereto as Exhibit "K."

As *Sequoia* undoubtedly knows, the photo simulations it has presented to the board are

inherently defective because they do not serve the purpose for which they have purportedly been

offered.

Local governments' primary purpose in requiring photo simulations of a proposed cell

tower is to ensure that the reviewing authority is provided with a clear visual image of the *actual*

aesthetic impacts that a proposed installation will inflict upon the nearby homes and residential

community.

Not surprisingly, applicants often seek to disingenuously minimize the visual impact

depictions by deliberately omitting from any such photo simulations any images **actually taken**

**from** the nearby homes that would sustain the most severe adverse aesthetic impacts.

18

In <u>Omnipoint Communications Inc. v. The City of White Plains,</u> 430 F2d 529 (2nd Cir. 2005), the United States Court of Appeals for the Second Circuit explicitly ruled that where a proponent of a wireless facility presents visual impact depictions wherein they "omit" any images from the actual perspectives of the homes which are in closest proximity to the proposed installation, such presentations are inherently defective, and should be disregarded by the respective government entity that received it.

As was explicitly stated by the federal court:

> "the Board was free to discount Omnipoint's study because it was conducted in a defective manner. . . ***the observation points were limited to locations accessible to the public roads, and no observations were made from the residents' backyards much less from their second story windows***" *Id.*
> <u>Omnipoint Communications Inc. v. The City of White Plains,</u>
> 430 F2d 529 (2nd Cir. 2005),

A simple review of the visual simulations submitted by *Sequoia* reflects that they do not include a single image taken from <u>any</u> of the nearby homes that will sustain the most severe adverse aesthetic impacts from the installation of the massive tower, which *Sequoia* seeks to construct in such close proximity to those homes.

Instead, it contains only an analysis from public roads and from perspectives selected to minimize the appearance of the adverse aesthetic impact, and it in no way accurately depicts the images those homeowners will see each and every time they look out their bedroom, kitchen, or living room window, or sit in their backyard.

This is the exact type of "presentation" the federal Court explicitly ruled to be defective in <u>Omnipoint</u>.

19

As such, in accord with the Federal Court's holding in <u>Omnipoint</u>, *AT&T's* Visual Resource Assessment should be recognized as inherently defective and disregarded in its entirety.

          D.        **The Proposed Installation Will Inflict Substantial and Wholly Unnecessary Losses in the Values <u>of Adjacent and Nearby Residential Properties</u>**

In addition to the adverse impacts upon the aesthetics and residential character of the neighborhood at issue, such an irresponsibly placed wireless facility in such close proximity to nearby residences would inflict upon those homes an adverse impact on the actual value of those residential properties.

As established by the evidence submitted herein, if *Sequoia* is permitted to install the proposed wireless facility in the virtual center of all the adjacent and nearby homes, it would inflict upon those homes losses in property value ranging from ten (10%) percent to as much as twenty-five (25%) percent.

Across the United States, real estate appraisers [8] and real estate brokers have rendered professional opinions that simply support what common sense dictates.

---

[8] *See, e.g.,* a February 22, 2012 article discussing a NJ appraiser's analysis wherein he concluded that the installation of a Wireless Facility in close proximity to a home had reduced the value of the home by more than 10%, go to http://bridgewater.patch.com/articles/appraiser -cell-tower-will-affect-property-values

When wireless facilities are installed unnecessarily close to residential homes, such homes suffer material losses in value, typically ranging from 15% to 20%, but up to 30% in some cases.[9] In the worst cases, facilities built near existing homes have caused the homes to be rendered wholly unsaleable.[10]

Federal courts recognize that it is perfectly proper for a local zoning authority to consider as direct evidence of the reduction in property values that an irresponsibly placed wireless facility would inflict upon nearby homes, the professional opinions of licensed real estate brokers (as opposed to appraisers) who provide their professional opinions as to the adverse impact upon property values that the installation of the proposed wireless facility would cause. See Omnipoint supra. This is conditionally true when they possess years of real estate sales experience within the community and the specific geographic area at issue.

---

[9] In a series of three professional studies conducted between 1984 and 2004, one set of experts determined that the installation of a Wireless Facility in close proximity to a residential home reduced the value of the home by anywhere from 1% to 20%. These studies were as follows:

      The Bond and Hue - *Proximate Impact Study* - The Bond and Hue study conducted in 2004 involved the analysis of 9,514 residential home sales in 10 suburbs. The study reflected that close proximity to a Wireless Facility reduced prices by 15% on average.

      The Bond and Wang - *Transaction-Based Market Study*

The Bond and Wang study involved the analysis of 4,283 residential home sales in 4 suburbs between 1984 and 2002. The study reflected that close proximity to a Wireless Facility reduced the price between 20.7% and 21%.

      The Bond and Beamish - *Opinion Survey Study*

The Bond and Beamish study involved surveying whether people who lived within 100' of a Wireless Facility would have to reduce the sales price of their home. 38% said they would reduce the price by more than 20%, 38% said they would reduce the price by only 1%-9%, and 24% said they would reduce their sale price by 10%-19%.

[10] Under FHA regulations, no FHA (federally guaranteed) loan can be approved for the purchase of any home that is situated within the fall zone of a Wireless Facility. *See* HUD FHA HOC Reference Guide Chapter 1 - hazards and nuisances. As a result, there are cases across the country within which: (a) a homeowner purchased a home, (b) a Wireless Facility was thereafter built in close proximity to it, and (c) as a result of same, the homeowners could not sell their home, because any buyer who sought to buy it could not obtain an FHA guaranteed loan. *See, e.g.,* October 2, 2012 Article ". . .Cell Tower is Real Estate Roadblock" at http://www.wfaa.com/news/consumer/Ellis-County-Couple--Cell-tower-making-it-impossible-to-sell-home--172366931.html.

21

As evidence of the adverse impact that the proposed facility would have upon the property values of the homes that would be adjacent and/or in close proximity to it, annexed hereto as Exhibit "L" are professional opinion letters from licensed real estate professionals, who provided their professional opinions that if the proposed tower is constructed where, and as, proposed by *Sequoia*, it will reduce the values of the nearby homes by between 10% and 25%, and make those homes less marketable, even at reduced purchase prices.

These Professional opinion letters include:

Professional opinion letters from Laura Berman, a licensed real estate broker in Nevada County for thirty (38) eight years, who tenders her specific professional opinions that the installation of the proposed tower at the proposed site would:

(a)     reduce the value of the residential home at **10962 Dog Bar Road** by twenty (20%) to twenty-five (25%) percent; *See* Exhibit "L."

(b)     reduce the value of the residential home at **21055 Dog Bar Road** by ten (10%) to fifteen (15%) percent; *See* Exhibit "L."

(c)     reduce the value of the residential home at **12060 Dog Bar Road** by ten  (10%) to fifteen (15%) percent; *See* Exhibit "L."

(d)     reduce the value of the residential home at **120793 Dog Bar Road** by ten (10%) to fifteen (15%) percent; *See* Exhibit "L."

(e)     reduce the value of the residential home at **1306 Amber Street** by ten (10%) to fifteen (15%) percent; *See* Exhibit "L." and

22

(f)     reduce the value of the residential home at **120791 Dog Bar Road**

by ten (10%) to fifteen (15%) percent. *See* Exhibit "L."

In addition, Cindy Kolari, who has been a licensed real estate broker in California for over thirty (30) years, proffers her professional opinion that the installation of the proposed 13-story tower at the proposed location will reduce the value of the nearby homes on Dog Bar Road and Amber Court by twenty to twenty-five (25%) percent. *See* Exhibit "L."

Based on the substantial adverse impacts the proposed tower's irresponsible placement will inflict upon the nearby homes and the surrounding community, *Sequoia*'s application should be denied because it does not meet the requirements of Sec. L-II 3.8 of the Code, in that the proposed tower siting is wholly incompatible with the adjacent and surrounding property uses.

E.     The Proposed Siting Lacks a Sufficient Fall Zone
and Would Subject the Adjacent Properties to the
Dangers of Structural Failures and Fire

The proposed siting for the thirteen-story tower would further violate Sec. L-II 3.8(A.), because the tower is proposed to be built just one hundred feet from the closest residential property.

Lacking a critical minimum setback/fall zone, the proposed tower would unnecessarily expose the closest home to the well-known dangers of structural failures and fire.

As detailed by the homeowner of 20962 Dog Bar Road, *Sequoia* seeks to construct its massive thirteen-story tower a mere 100 feet from their home.

A true copy of a letter from Ashley Permenter attesting to same is annexed hereto as Exhibit "M."

23

As such, *Sequoia's* application should be denied because its proposed siting would not be compatible with the adjacent use of the Permenter's residential property. It would unnecessarily expose their home to the precise types of dangers that local governments require minimum setback requirements and minimum fall zones to prevent.

(i)    Structural Failures

The design proposed for *Sequoia's* thirteen-story tower is that of a standard <u>monopole</u> *(proposed as a "monopine"),* which would stand one hundred and twenty-nine feet in height.

As has been proven time and time again, the most common point of structural failure for this type of monopole *is the base* of the tower, and more often than not, when they fail, they tend to "lay over" and crush and destroy anyone and anything within a distance equal to at least the height of the tower.

Such was the case in the notorious Oswego Firehouse case, where a virtually brand new 165-foot monopole collapsed, going from being 165 feet tall to 165 long in a matter of seconds, crushing the Fire Chief's vehicle in the process.

Annexed hereto as Exhibit "N" are actual photographs of the collapsed monopole, the damage it caused, and an article detailing the incident.

The Oswego case was far from an isolated incident of a monopole's failure from its base, wherein the tower collapsed to a distance equal to the full length of the tower or more. *See* the additional sampling of images of monopole baseplate and/or base failures annexed hereto as Exhibit "O."

These images depict the precise reason why local governments require minimum setback requirements for cell towers, and the precise reason *Sequoia's* application to site its proposed tower

24

without affording a sufficient fall zone to ensure the protection of the Permenter's home should be denied.

(ii)    Fires

The second well-documented danger associated with cell towers, which mandate the maintenance of minimum setback requirements, is the danger of fire.

As often as once per month, a monopole cell tower will burst into flames somewhere within the United States, with some falling over in a flaming heap, igniting anything within its reach.

Perhaps the most notorious flaming collapse of a monopole cell tower was that which collapsed in Wellesley, Massachusetts, in clear view of hundreds of cars driving by while the fire department stood by and was incapable of stopping the collapse. Cases of such fires and collapses of monopole cell towers are amply documented.[8]

Annexed hereto respectively as Exhibits "P" and "Q" are an image of the Wellesley monopole cell tower just before it collapsed in a flaming heap and a sampling of stories of other documented cases of monopole cell towers having erupted in flames.

Once again, these types of known dangers compel local governments to maintain sufficient setback requirements for monopole cell towers, affording necessary protection to nearby structures and properties.

This is yet another reason why *Sequoia's* request to site its proposed tower without a sufficient fall zone to ensure protection for the adjacent Permenter residence should be denied.

---

[8] The full video of the Wellesley tower collapsing can be located and viewed on *YouTube* by performing a search for "cell tower burns to the ground."

## POINT IV

§ 6409(a) of the Middle-Class Tax Relief and Job Creation Act
of 2012 Would Allow *Sequoia* to Increase the Height
of the Proposed Facility Without Further Zoning Approval

As severe as the adverse impacts upon the nearby homes and community would be if the 129-foot facility were constructed as proposed by *Sequoia* if such a facility were to be built, *Sequoia* could unilaterally choose to increase the height of the facility by as much as twenty (20) feet, and the County would be legally prohibited from stopping them from doing so due to the constraints of the Middle-Class Tax Relief and Job Creation Act of 2012.

§6409(a) of the Middle-Class Tax Relief and Job Creation Act of 2012 provides that notwithstanding Section 704 of the Telecommunications Act of 1996 or any other provision of law, a State or local government may not deny and shall approve any eligible request for a modification of an existing wireless facility or base station that does not substantially change the physical dimensions of such facility or base station. See 47 U.S.C. §1455(a).

Under the FCC's reading and interpretation of §6409(a) of the Act, local governments are prohibited from denying modifications to wireless facilities unless the modifications will "substantially change" the physical dimensions of the facility, pole, or tower.

The FCC defines "substantial change" to include any modification that would increase the height of the facility by more than ten (10%) percent or by more than "the height of one additional antenna with separation from the nearest existing antenna not to exceed 20 feet, whichever is greater."

This height increase could not be challenged or prevented by the County.

In other words, under the FCC's regulation, if this facility were to be built, *Sequoia*

26

could unilaterally increase the height of any such facility by as much as twenty (20) feet at any time thereafter, and the County would have no way to prevent such an occurrence.

Considering the even more extreme adverse impacts that an increase in the height of the facility would inflict upon the homes and communities nearby, *Sequoia's* application should be denied, conditionally since, as set forth herein above, *Sequoia* does not actually need the proposed facility.

**POINT V**

To Comply With the TCA, *Sequoia's* Application Should
Be Denied in a Written Decision Which
<u>Cites the Evidence Provided Herewith</u>

The Telecommunications Act of 1996 requires that any decision denying an application

to install a wireless facility: (a) be made in writing and (b) be made based upon

substantial evidence, which is discussed in the written decision. See 47 U.S.C.A.

§332(c)(7)(B)(iii).

A.    <u>The Written Decision Requirement</u>

To satisfy the requirement that the decision be in writing, a board must issue a written

denial, which is separate from the written record of the proceeding and which contains a

sufficient explanation of the reasons for the denial to allow a reviewing court to evaluate the

evidence in the record supporting those reasons. *See, e.g.,* <u>MetroPCS v. City and County of San</u>

<u>Francisco</u>, 400 F.3d 715 (2005).

In accord with same, it is respectfully requested that the appellants' appeal be granted, and

that *Sequoia*'s application be denied in a written decision finding that (a) the proposed tower

would inflict substantial adverse impacts upon the adjacent and nearby residential homes, both in

inflicting substantial adverse aesthetic impacts, and causing reductions in their property values,

(b) the applicant has failed to establish any actual need for the tower, or the existence of any

significant gaps in Verizon's personal wireless services, and (c) the applicant has failed to show

that a denial of its application to construct its proposed tower would "materially inhibit" Verizon

from competing in providing its personal wireless services in a fair and balanced regulatory

environment.

28

B.    The Substantial Evidence Requirement

To satisfy the requirement that the decision be based upon substantial evidence, the decision must be based upon such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

The most authoritative and widely quoted explanation of the TCA's "substantial evidence" requirement comes from Cellular Tel. Co. v. Town of Oyster Bay: "substantial evidence implies 'less than a preponderance, but more than a scintilla of evidence.'." 166 F.3d 490 (2d Cir. 1999). *See also*, GTE Mobilnet, supra.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id., quoting MetroPCS, Inc. v. City and Cty. of San Francisco, 400 F.3d 715 (9th Cir. 2005).

The homeowners on whose behalf this brief has been submitted have met their burden of proving that *Sequoia* has failed to offer sufficient evidence to warrant granting its application.

To ensure that the County's decision to deny this application cannot be challenged under the Telecommunications Act of 1996, it is respectfully requested that the Board deny *Sequoia's* application in a written decision wherein the Board cites the substantial evidence upon which it based its determination.

C.    The Non-Risks of Litigation

All too often, representatives of wireless carriers and/or site developers try to intimidate local zoning officials with either open or veiled threats of litigation. These threats of litigation under the TCA are, for the most part, entirely hollow.

29

This is because, even if they file a federal action against the County and win, the Telecommunications Act of 1996 does not entitle them to recover compensatory damages or attorneys' fees, even if they get creative and try to characterize their cases as claims under 42 U.S.C. §1983.[11]

This means that if they were to sue the County and win, the County would not pay them anything in damages or attorneys' fees under the TCA.

Typically, the only expense incurred by the local government is its own attorneys' fees. Since federal law mandates that TCA cases proceed on an "expedited" basis, they typically last a comparatively short time. Because of their brevity and relative simplicity, the attorneys' fees incurred by a local government are typically quite small compared to virtually any other type of litigation.

---

[11] *See City of Rancho Palos Verdes v. Abrams*, 125 S.Ct. 1453 (2005), *Network Towers LLC v. Town of Hagerstown*, 2002 WL 1364156 (2002), *Kay v. City of Rancho Palos Verdes*, 504 F.3d 803 (9th Cir 2007*), Nextel Partners Inc. v. Kingston Township*, 286 F.3d 687 (3rd Cir 2002).

## <u>Conclusion</u>

For all of the foregoing reasons, the appellants respectfully request that:

(a)      **this appeal** of the decision granting *Sequoia's* application **be granted**, and

(b)      *Sequoia***'s application** for a Conditional Use Permit to build its proposed

thirteen-story cell tower **be denied** in its entirety.

31

NEVADA COUNTY
STATE OF CALIFORNIA
-----------------------------------------------------------------------X

In the Matter of the Application of:

**SEQUOIA DEPLOYMENT SERVICES INC.**

Application for Conditional Use Permit          *EXHIBITS IN*
Premises:     20896 Dog Bar Road,          *SUPPORT OF APPEAL*
               Grass Valley, CA 95949


Permit No.:   CUP23-0015
A.P.N:      027-010-018
-----------------------------------------------------------------------X



*EXHIBITS IN*
*SUPPORT OF APPEAL*


Respectfully Submitted,


Jeffrey and Kristin Phalen, 13106 Amber Street, Grass Valley, California 95949
Bruce Roush, 20791 Dog Bar Road, Grass Valley, California 95949
Janet Brisson, 20693 Dog Bar Road, Grass Valley, California 95949
Gregory, Linnie, and Laura McNaughton, 21055 Dog Bar Road, Grass Valley, California 95949
Kienan Parr, 21055 Dog Bar Road, Grass Valley, California 95949
Jerry and Ashley Permenter 20962 Dog Bar Road, Grass Valley, California 95949
Mr. and Mrs. Krecek, 20962 Dog Bar Road, Grass Valley, California 95949
Sandy Mallory, 12950 Amber Street, Grass Valley, California 95949
Max and Lisa Krewson, 20915 Hickman Pass Road, Grass Valley, California 95949
Doug and Jill Boan, 21038 Hickman Pass Road, Grass Valley, California 95949

**Exhibits in
Support of Appeal**

A      *Sequoia* Web Site Page – Re Real Estate Services Company

B      *Sequoia* Web Site Page – Re Identifying properties suitable for cell towers

C      ZA Staff Report, page 8, June 12, 2024

D      Purported "Coverage Maps" dated July 14, 2023

E      *Verizon* Wireless' ***actual*** Coverage Map for 20896 Dog Bar Road,
       Grass Valley California - Current as of 6/22/2024

F      FCC Staff report, GN Docket # 19-367, second page.

G      Courtesy copy of Federal Court decision in <u>ExteNet Systems, Inc. v.
       Village of Flower Hill</u>, No. 19-CV-5588-FB-VMS (E.D.N.Y. July 29, 2022),

H      List of twelve (12) *Verizon* Frequencies at which *Verizon* provides its personal wireless
       services to its end-use customers

I      FCC Document Requiring Actual Drive Testing

J      Adverse Aesthetic Impact Letters

K      Sequioa's Photo-Simulations

L      Licensed Brokers' Professional Opinion Letters
       Pertaining to Reductions in Property Values

M      Letter from Ashley Permenter

N      Oswego Fire House Monopole Collapse Images and Article

O      Additional Monopole Collapse Images

P      Wellesley Monopole Fire Collapse Image

Q      Images of Recent Monopole Fires

# EXHIBIT A





Login

SITE ACQUISITION ▸   LAND USE PLANNING ▸   LEASE ADMINI



Home

Services

Opportunities

STAR

About Us

Contact Us

Welcome to Sequoia Deployment Services, Inc.

Sequoia is a real estate services company specializing in providing site acquisition and deployment services to the wireless telecommunications industry including the application of project controls to monitor the progress of each site. In addition, we provide a complete range of services to assist our clients in the development of commercial properties.

© 2004-2011 Sequoia Deployment Services, Inc

# EXHIBIT B





SITE ACQUISITION •  LAND USE PLANNING



Home
Services
Opportunities
STAR
About Us
Contact Us

Site Acquisition
Land Use Planning
Lease Administration
Utility Coordination
Permit Processing
Const. Coordination
Project Management

## Site Acquisition

Identify properties that are suitable for communications sites and negotiate leases with landowners.

Sequoia assumes responsibility for each assigned site and represents its clients in identifying properties for sites and negotiating leases with landowners.

© 2004-2011 Sequoia Deployment Services, Inc

# EXHIBIT C

The developers state that the site will be identifiable in online databases so it's existence will be known to other wireless carriers. It will also be included in online site search tools and identifiable by other wireless carriers and firms working in the wireless industry looking for collocation opportunities. Signage will be posted at the site identifying the party to contact regarding the project and will include site identification information. If another wireless carrier has interest in collocating, they can use the site identification information to confirm availability and details for the facility via e-mail or phone. If the facility meets the collocation wireless carrier's requirements, they will then file an application to the owner to formally start the collocation process. All notifications and required documentation is provided to the property owner, a lease is secured, and all necessary permits are obtained before the collocating wireless carrier installs their equipment. The owner of the communication tower would also have to apply to Nevada County for an Administrative Development Permit for the addition of the co-located carrier.

Site Justification:

Verizon Wireless identified a significant gap in its Long Term Evolution (LTE) wireless service in the south eastern area of Nevada County, California. Verizon Wireless evaluated four site alternatives within the identified significant coverage/capacity gap. Based on the analysis and evaluation, Verizon Wireless concludes that the proposed monopine at 20896 Dog Bar Road is the most feasible site to address the gap in coverage when topography, radio frequency propagation, elevation, height, available electrical and telephone utilities, access, and a willing landlord are considered. 20896 Dog Bar Road is the only location that meets RF's objectives, is owned by a property owner willing to lease the space, and is a location that allows the monopine to blend in with the natural surroundings.

Nevada County Land Use and Development Code Section L-II 3.8.E prohibits new towers from being installed in a location that is not already developed with public or quasi-public uses or other communication facilities, unless it blends with the surrounding, existing natural and man-made environment so as to be effectively unnoticeable. This section of the Code also prohibits new towers from being installed closer than 2-miles from another readily visible, un-camouflaged or unscreened facility unless it is a co-located facility, on a multiple-user site, or is designed to blend in with the surrounding, existing natural and man-made environment so as to be effectively unnoticeable. While the subject tower is not proposed on a location with public or quasi-public uses or on a location with existing communication facilities, it is proposed to be constructed to look like a pine tree, meeting the visual screening and setback criteria while providing service in the desired service area and is therefore in compliance with LUDC Section L-II 3.8.E.

Radio Frequency Signals:

The Federal Communications Commission (FCC) is the government agency responsible for the authorization and licensing of facilities such as cellular towers that generate RF radiation. Radiofrequency (RF) radiation emanates from antenna on cellular towers and is generated by the movement of electrical charges in the antenna. The energy levels it generates are not great enough to ionize, or break down, atoms and molecules, so it is known as "non-ionizing" radiation. The FCC has developed and adopted guidelines for human exposure to RF radiation using the recommendations of the National Council on Radiation Protection and Measurements (NCRP) and the Institute of Electrical and Electronics Engineers (IEEE), with the support of the EPA, FDA, OSHA and NIOSH. According to the FCC, both the NCRP exposure criteria and the IEEE standard were developed by expert scientists and engineers after extensive reviews of the scientific literature related to RF biological effects. The exposure guidelines are based on thresholds for known adverse effects, and they incorporate wide

# EXHIBIT D

# Dog Bar Site

## Coverage Maps

July 14, 2023

verizon✓

Verizon confidential and proprietary. Unauthorized disclosure, reproduction or other use prohibited.

# Existing AWS Coverage Map



**Legend**

LTE: RSRP - Coverage
- In-Building Coverage
- In-Vehicle Coverage
- Outdoor Coverage

Verizon confidential and proprietary. Unauthorized disclosure, reproduction or other use prohibited.

verizon✓

## After AWS Coverage Map



Verizon confidential and proprietary. Unauthorized disclosure, reproduction or other use prohibited.

verizon√

# Dog Bar AWS Coverage Map





Verizon confidential and proprietary. Unauthorized disclosure, reproduction or other use prohibited.



# EXHIBIT E



# EXHIBIT F

Federal Communications Commission

GN Docket No. 19-367

MOBILITY FUND PHASE II

COVERAGE MAPS INVESTIGATION

STAFF REPORT

**TABLE OF CONTENTS**

Heading                                                                                          Paragraph #

I.   INTRODUCTION ........................................................................................................... 1
II.  BACKGROUND ............................................................................................................ 11
III. COMPARATIVE ANALYSIS OF THE MF-II 4G LTE COVERAGE DATA ................................. 37
IV.  UPLINK CHANNEL INQUIRIES .................................................................................... 44
V.   MOBILE SPEED TESTING AND ANALYSIS OF SPEED TEST DATA ....................................... 52
     A.  Test Methodology ................................................................................................ 55
     B.  Drive Test Results ................................................................................................ 59
     C.  Stationary Test Results ......................................................................................... 70
VI.  CONCLUSIONS .......................................................................................................... 73
APPENDIX A – FORM 477 FILERS THAT SUBMITTED MF-II 4G LTE COVERAGE DATA
APPENDIX B – ADDITIONAL FINDINGS FROM THE MF-II CHALLENGER DATA
APPENDIX C – RESOURCES

I.   **INTRODUCTION**

1.      Bridging the digital divide is the Federal Communications Commission's top priority, and accurate broadband deployment data are critical to this mission. As part of the Commission's ongoing effort to reform universal service funding of mobile wireless services and focus subsidies on unserved areas rather than on areas that already have service, the Commission unanimously adopted a new data collection of 4G Long-Term Evolution (LTE) mobile broadband coverage maps and a challenge process to determine areas eligible for support in the Mobility Fund Phase II (MF-II) auction. The largest mobile providers supported both this data collection and the challenge process. After mobile providers submitted coverage maps to the Commission and during the challenge process, some parties raised concerns regarding the accuracy of the maps submitted by providers. Based on these parties' complaints and its own review of the record, staff became concerned that maps submitted by Verizon, U.S. Cellular, and T-Mobile overstated their coverage and thus were not accurate reflections of actual coverage.

2.      Mobile providers are responsible for submitting accurate coverage maps in accordance with the Commission's rules and orders. In response to these concerns and based upon a preliminary staff review of the challenger data, on December 7, 2018, the Commission launched an investigation into whether one or more major mobile providers violated the requirements of the one-time collection of coverage data. The investigation was led by the Rural Broadband Auctions Task Force in coordination with the Office of Economics and Analytics, Enforcement Bureau, Wireless Telecommunications Bureau, Wireline Competition Bureau, and the Office of Engineering and Technology. Commission staff initially requested information directly from several providers in order to understand providers' mapping processes, and later issued subpoenas to Verizon and U.S. Cellular.

Federal Communications Commission

3.      The Commission dispatched Enforcement Bureau field agents to conduct speed tests of the Verizon, U.S. Cellular, and T-Mobile networks. Commission field agents measured on-the-ground network performance in 12 states across six drive test routes,[1] conducting a total of 24,649 tests and driving nearly 10,000 miles in the course of this testing. Field agents also conducted 5,916 stationary speed tests at 42 distinct locations in nine states. Commission staff analyzed the speed test data from both the staff tests and MF-II challengers' speed tests and compared these test data with the maps submitted for the MF-II data collection as well as with maps providers had previously submitted to the Commission in other proceedings. This report documents the steps and processes undertaken by staff to investigate the coverage maps, analyzes speed tests taken by staff and submitted by challengers, and explains why discrepancies may exist between the submitted maps and actual coverage.

4.      Through the investigation, staff discovered that the MF-II coverage maps submitted by Verizon, U.S. Cellular, and T-Mobile likely overstated each provider's actual coverage and did not reflect on-the-ground performance in many instances. Only 62.3% of staff drive tests achieved at least the minimum download speed predicted by the coverage maps—with U.S. Cellular achieving that speed in only 45.0% of such tests, T-Mobile in 63.2% of tests, and Verizon in 64.3% of tests. Similarly, staff stationary tests showed that each provider achieved sufficient download speeds meeting the minimum cell edge probability in fewer than half of all test locations (20 of 42 locations). In addition, staff was unable to obtain any 4G LTE signal for 38% of drive tests on U.S. Cellular's network, 21.3% of drive tests on T-Mobile's network, and 16.2% of drive tests on Verizon's network, despite each provider reporting coverage in the relevant area.

5.      The Commission and the public must be able to rely on the deployment data that providers submit to the Commission. Inaccurate data jeopardize the ability of the Commission to focus our limited universal service funds on the unserved areas that need the most support. Accordingly, and considering the findings in this report, the Rural Broadband Auctions Task Force makes the following recommendations:

6.      *First*, the Commission should terminate the MF-II Challenge Process. The MF-II coverage maps submitted by several providers are not a sufficiently reliable or accurate basis upon which to complete the challenge process as it was designed. The MF-II Challenge Process was designed to resolve coverage disputes regarding generally reliable maps; it was not designed to correct generally overstated coverage maps.

7.      *Second*, the Commission should release an Enforcement Advisory on broadband deployment data submissions, including a detailing of the penalties associated with filings that violate federal law, both for the continuing FCC Form 477 filings and the new Digital Opportunity Data Collection. Overstating mobile broadband coverage misleads the public and can misallocate our limited universal service funds, and thus it must be met with meaningful consequences.

8.      *Third,* the Commission should analyze and verify the technical mapping data submitted in the most recent Form 477 filings of Verizon, U.S. Cellular, and T-Mobile to determine whether they meet the Form 477 requirements. Staff recommends that the Commission assemble a team with the requisite expertise and resources to audit the accuracy of mobile broadband coverage maps submitted to the Commission. The Commission should further consider seeking appropriations from Congress to carry out drive testing, as appropriate. While Form 477 currently affords providers significant discretion in

---

[1] Although staff focused its testing on these six drive test routes in particular states, some tests were taken in neighboring states along several test routes. Specifically, a portion of tests were taken in Arizona on the New Mexico test route; in Kansas, New Mexico, and Texas on the Oklahoma test route; in Wyoming and North Dakota on the Montana test route; and in Massachusetts and New Hampshire on the Vermont test route. Tests on the Alabama and Arizona drive test routes were taken entirely within those states.

# EXHIBIT G

2022 WL 3019650
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

EXTENET SYSTEMS, INC., Plaintiff,

v.

VILLAGE OF FLOWER HILL and Flower
Hill Village Board of Trustees, Defendants.

Case No. 19-CV-5588-FB-VMS
|
Signed July 29, 2022

## Synopsis

**Background:** Company that built and operated
telecommunications infrastructure brought action against
village and its board of trustees alleging that board's
denial of its application for a permit to install wireless
infrastructure on public rights-of-way in the village violated
the Telecommunications Act and New York law. Parties
cross-moved for summary judgment.

**Holdings:** The District Court, Frederic Block, Senior District
Judge, held that:

[1] board's denial of company's application did not violate
the Telecommunications Act's ban on prohibiting personal
wireless services;

[2] board's denial of company's application was supported by
substantial evidence;

[3] board's denial of company's application could
not be viewed as discriminatory in violation of the
Telecommunications Act; and

[4] board's denial of company's application did not violate
New York law.

Defendants' motion granted and plaintiff's motion denied.

West Headnotes (10)

**[1]  Zoning and**
    **Planning** ⇦ Telecommunications issues

Pursuant to the substantial evidence review
required by the Telecommunications Act,
courts may neither engage in their own fact-
finding nor supplant a local zoning board's
reasonable determinations, when confronted
with a challenge to a board's decision to deny
a permit to place, construct, or modify personal
wireless service facilities. Communications Act
of 1934 § 332, 47 U.S.C.A. § 332(c)(7)(B)(iii).

**[2]  Zoning and**
    **Planning** ⇦ Telecommunications issues

In determining whether a local zoning board's
denial of permit to place, construct, or modify
personal wireless service facilities is supported
by substantial evidence, "substantial evidence"
means such relevant evidence as a reasonable
mind might accept as adequate to support a
conclusion. Communications Act of 1934 § 332,
47 U.S.C.A. § 332(c)(7)(B)(iii).

**[3]  Zoning and**
    **Planning** ⇦ Telecommunications issues

If a court finds that even one reason given for
the denial of an application to place, construct,
or modify personal wireless service facilities is
supported by substantial evidence, the decision
of the local zoning body cannot be disturbed.
Communications Act of 1934 § 332, 47 U.S.C.A.
§ 332(c)(7)(B)(iii).

**[4]  Zoning and**
    **Planning** ⇦ Telecommunications towers and
    facilities

Village board of trustees did not
violate Telecommunications Act's ban on
prohibiting personal wireless services when it
denied wireless telecommunications company's
application for a permit to install wireless

facilities on public rights-of-way in the village, on ground that there was no gap in cellular service coverage; company sought permit based on contract that it had with major wireless service provider to improve provider's service in village, but the Telecommunications Act did not protect improved capacity and speed of service, and it was undisputed that signal strength far less than what provider desired would have been sufficient to make a phone call. Communications Act of 1934 § 253, 47 U.S.C.A. § 253(a).

[5]    **Zoning and**
**Planning**  ⟸  Telecommunications towers and facilities

Although Telecommunications Act requires that denial of application to install wireless facilities be supported by substantial evidence, it does not set any substantive standards for evaluating application; that authority must be found in state or local law. Communications Act of 1934 § 332, 47 U.S.C.A. § 332(c)(7)(B)(iii).

[6]    **Zoning and**
**Planning**  ⟸  Telecommunications towers and facilities

Under New York law, lack of public necessity can justify a denial of an application to install wireless facilities. Communications Act of 1934 § 332, 47 U.S.C.A. § 332(c)(7)(B)(iii).

[7]    **Zoning and**
**Planning**  ⟸  Telecommunications towers and facilities

Under New York law, for an application to install wireless facilities to be granted based on public necessity, an applicant must show that there is a gap in cellular service, and that building the proposed facility is more feasible than other options. Communications Act of 1934 § 332, 47 U.S.C.A. § 332(c)(7)(B)(iii).

[8]    **Zoning and**
**Planning**  ⟸  Telecommunications towers and facilities

Substantial evidence supported village board of trustees' conclusion that installation of wireless facilities on public rights-of-way in the village was not necessary for the public, and thus board's denial of wireless telecommunications company's application for a permit to install wireless facilities was justified; while company requested permit based on contract that it had with major wireless service provider to improve provider's service in village, evidence established that there was no gap in coverage, and that signal strength far less than what provider desired would have been sufficient to make a phone call. Communications Act of 1934 § 332, 47 U.S.C.A. § 332(c)(7)(B)(iii).

[9]    **Zoning and**
**Planning**  ⟸  Telecommunications towers and facilities

Village board of trustees' denial of wireless telecommunications company's application for a permit to install small wireless facilities on public rights-of-way in the village could not be viewed as a discriminatory denial, in violation of the Telecommunications Act, absent evidence that another company's structure or facility that offered functionally equivalent services had been approved. Communications Act of 1934 § 332, 47 U.S.C.A. § 332(c)(7)(B)(i)(I).

[10]    **Zoning and**
**Planning**  ⟸  Telecommunications towers and facilities

Village board of trustees' denial of wireless telecommunications company's application for a permit to install small wireless facilities on public rights-of-way in the village did not violate New York statute providing that any telephone or telegraph corporation could erect, construct, and maintain necessary fixtures for its lines upon, over, or under any of the public roads, streets, and highways, where the statute also required corporations to obtain permission from

the board to use the streets within its village, and company did not receive board's permission. N.Y. Transportation Corporations Law § 27.

**Attorneys and Law Firms**

For the Plaintiff: CHRISTOPHER B. FISHER, BRENDAN GOODHOUSE, Cuddy & Feder LLP, 445 Hamilton Avenue, 14th Floor, White Plains, New York 10601.

For the Defendants: EDWARD M. ROSS, JUDAH SERFATY, Rosenberg Calica & Birney LLP, 100 Garden City Plaza, Suite 408, Garden City, New York 11530.

**MEMORANDUM AND ORDER**

BLOCK, Senior District Judge:

**\*1** In this action under the Telecommunications Act of 1996 ("the Act"), 47 U.S.C. §§ 251-61, 332(c)(7), ExteNet Systems, Inc. ("ExteNet"), seeks judicial review of a decision of the Flower Hill Village Board of Trustees ("the Village" or "the Board") denying ExteNet's application for a permit to install wireless infrastructure on public rights-of-way in the village. Both parties move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following, reasons the Village's motion is granted and ExteNet's is denied.

**I**

The following facts are taken from the pleadings and the parties' Rule 56.1 statements. Except where noted, they are undisputed.

ExteNet builds and operates telecommunications infrastructure, including "small wireless facilities" that house low-power antennas to improve network connectivity. It operates under a Certificate of Public Convenience and Necessity ("CPCN") from the New York State Public Service Commission.

As their name suggests, small wireless facilities are substantially smaller than the large, freestanding cellular towers traditionally used by providers. They are about the size of a backpack and, under regulations promulgated by the

Federal Communications Commission ("FCC"), are mounted on structures (such as utility poles or buildings) no more than 50 feet high or 10% taller than adjacent structures, whichever is greater. *See* 47 C.F.R. § 1.6002(l)(1).

For approximately seven years, ExteNet has been under contract with Verizon Wireless, a major wireless provider, to build and operate small wireless facilities throughout Long Island. The stated goal of the contract is to improve coverage of Verizon's 4G LTE network.[1] In broad terms, Verizon identifies a deficiency in its network and asks ExteNet to design a solution that will provide a specified signal strength over a specified area. Pursuant to its CPCN, ExteNet must secure permission from the local authorities before beginning installation.

In 2016, Verizon identified the area around the Village of Flower Hill as having insufficient 4G LTE service and asked ExteNet to design and install a network of 66 small wireless facilities, eighteen of which would be located within the Village. Verizon estimated that the network would provide a signal strength of -85 decibel-milliwatts (dBm) to 90% of the area under consideration.

ExteNet first filed a permit application for one small wireless facility in May 2017. Shortly thereafter, the Village imposed a moratorium on such applications while it considered an ordinance governing them. In March 2019 the Board adopted Article VIII to Chapter 209 of the Village Code ("Article VIII"), which now regulates the approval process for small wireless facilities.

In the meantime, ExteNet had filed permit applications for the eighteen small wireless facilities to be located within the Village in late 2018 and early 2019. ExteNet proposed mounting the facilities on ten new utility poles, two existing poles and six replacement poles. At a meeting with ExteNet in April 2019, Village officials expressed a preference for more "decorative" poles disguised as streetlights and fewer utility poles. In response, ExteNet submitted a revised proposal for eleven streetlights, two existing poles and five replacement poles.

**\*2** The Board held public hearings on ExteNet's application on May 6 and June 3, 2019. Opposition to the proposal, which came from both members of the Board and residents, focused on the lack of need for improved 4G LTE coverage, adverse affects on Village's aesthetic and concerns about exposure to radio waves. In response, ExteNet offered to reduce the height

of the mounting structures from 30 to 20 feet and to work with a consultant on an aesthetically acceptable streetlight design. Nevertheless, a third public meeting on July 1, 2019, revealed continued opposition.

Later in July, ExteNet hosted a public forum to discuss and identify designs for the decorative streetlights. No consensus emerged, with several participants rejecting the possibility of any acceptable design and others expressing a preference for existing utility poles. ExteNet then submitted yet another alternative using one or two streetlights, one flagpole, three existing poles, six or seven new poles and six replacement poles. At a fourth public meeting on August 5, 2019, ExteNet described the first proposal as focusing on utility poles, the second on decorative poles, and the third as a hybrid of the two.

At a public meeting held on September 3, 2019, the Board voted on ExteNet's application and unanimously denied it. It then approved a written statement of findings prepared by the Village Attorney and entered them into the record. As grounds for the denial, the statement of findings cited: "(1) the significant adverse aesthetic and property values impacts of the 18 nodes permeating the tiny Village; (2) there is no gap in wireless coverage for Verizon and no need to justify the significant adverse impacts; and (3) ExteNet's abject refusal to submit for consideration an actual fixed plan for each of the 18 wireless nodes and poles, instead offering multiple different plans, with different pole/node locations and configurations, abject refusal and failure to provide onsite photo simulations for each of its proposed nodes, and refusal to comply with the public notice provisions of the Village Code which further required denial of the application." Defs. 56.1 Stmt. ¶ 13.

This action followed.

## II

### A. The Act's Preemptive Effect

The Act declares that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). It then provides, however, that "[n]othing in this section affects the authority of a State or local government to manage the public rights-of-way ..., on a competitively neutral and nondiscriminatory basis[.]" *Id.* § 253(c). These

declarations are repeated—perhaps unnecessarily—later in the Act:

> (A) General authority
>
> Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.
>
> (B) Limitations
>
> (i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof —
>
> > (I) shall not unreasonably discriminate among providers of functionally equivalent services; and
> >
> > (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

*Id.* § 332(c)(7).

### B. Substantial Evidence

[1] [2] [3] In addition to banning prohibitions (or effective prohibitions) and discrimination, the Act requires that any denial of an application "to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). Substantial-evidence review is a "deferential standard, and courts may neither engage in their own fact-finding nor supplant the Board's reasonable determinations." *Omnipoint Comm'ns, Inc. v. City of White Plains*, 430 F.3d 529, 533 (2d Cir. 2005) (internal quotation marks and alterations omitted). "Substantial evidence, in the usual context, has been construed to mean less than a preponderance, but more than a scintilla of evidence." *Id.* (internal quotation marks omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). "If the Court finds that even one reason given for the denial is supported by substantial evidence, the decision of the local zoning body cannot be disturbed." *T-Mobile Ne. LLC v. Town of Islip*, 893 F. Supp. 2d 338, 355 (E.D.N.Y. 2012) (internal quotation marks and alteration omitted).

## C. Summary

*3 To summarize, the Act "is in many important respects a model of ambiguity or indeed even self-contradiction." *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 397, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). But at least three clear principles emerge from the statutory language and cases construing it.

First, the Act forbids a municipality from prohibiting or effectively prohibiting the provision of personal wireless services. Any local permitting requirement that does so is preempted.

Second, the Act requires a municipality to support its decision with substantial evidence.

Third, the Act requires a municipality to make its permitting decisions in a nondiscriminatory manner. A coverage gap has no apparent bearing on discrimination; rather, the statutory standard is whether the favored and disfavored applicants offer "functionally equivalent services," 47 U.S.C. § 332(c)(7)(B)(i)(I).

With these principles in mind, the Court turns to ExteNet's claims in this case.

## III

ExteNet's complaint includes four claims. First, it alleges that Article VIII is preempted because it facially constitutes an effective prohibition on personal wireless services in violation of 47 U.S.C. § 253(a). Second, it alleges that Article VIII, as it was applied to its permit application, is preempted for the same reason. Third, it alleges that the denial of its application violated § 332(c)(7) because it was an effective prohibition, discriminatory, and not supported by substantial evidence. Fourth, it claims that the denial violated § 27 of New York's Transportation Corporations Law.

The parties' motions for summary judgment reframe the issues in a more sensible way. The balance of this memorandum and order addresses those issues.

## A. Did the Board's denial effectively prohibit personal wireless services?

As noted, the Act is not a model of clarity. In part, this is because it "strikes a balance between two competing aims —to facilitate nationally the growth of wireless telephone

service and to maintain substantial local control over siting of towers." *Omnipoint*, 430 F.3d at 531 (internal quotation marks omitted).

The Second Circuit addressed where the balance lay in *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630 (2d Cir. 1999). After "a detailed parsing of the statutory language, including layers of highly technical definitions," the circuit court held that the proper balance could be found by deciding "what Congress meant by 'personal wireless services.' " *Id.* at 641. It then concluded that "local governments may not regulate personal wireless service facilities in such a way as to prohibit remote users from reaching such facilities." *Id.* at 643. "In other words, local governments must allow service providers to fill gaps in the ability of wireless telephones to have access to land-lines." *Id.*

[4] By contrast, the stated intent of Verizon's contract with ExteNet was to improve Verizon's 4G LTE service. Indeed, it is undisputed that a signal strength far less than Verizon's desired -85 dBm would still be sufficient to make a phone call. *See* Defs. Counter 56.1 Stmt. ¶ 151 ("At the level of signal strength is typically when the mobile user would experience their device "downshift" into 3G or even 1X service which only supports voice." (quoting ExteNet's engineering expert)).

*4 ExteNet objects that a 2018 ruling by the FCC expands the scope of the Act to include services beyond access to a telephone network. In that ruling, the FCC "clarif[ied] that an effective prohibition occurs where a state or local legal requirement materially inhibits a provider's ability to engage in any of a variety of activities related to its provision of a covered service. This test is met not only when filling a coverage gap but also when densifying a wireless network, introducing new services or otherwise improving service capabilities." *In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*, 33 F.C.C.R. 9088, 9104-05 (2018) (footnotes omitted).

ExteNet argues that the FCC's ruling is entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). However, Chevron deference applies only when the statute in question is silent or ambiguous. *See id.* at 842-43, 104 S.Ct. 2778. Although the Second Circuit found the phrase "personal wireless services" "opaque," it ultimately relied on "[t]he plain statutory language" to define it. Therefore, the phrase was not ambiguous.

Improved capacity and speed are desirable (and, no doubt, profitable) goals in the age of smartphones, but they are not protected by the Act. *See Willoth*, 176 F.3d at 643 ("We hold only that the Act's ban on prohibiting personal wireless services precludes denying an application for a facility that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land-lines."). The circuit court may wish to reconsider its definition in light of new technology, but the Court is not in a position to ignore its binding pronouncement. *Accord Crown Castle NG East LLC v. Town of Hempstead*, 2018 WL 6605857, at *9 (E.D.N.Y. Dec. 17, 2018) ("A gap in 4G coverage does not establish that the target area is underserved by voice cellular telephone service."); *Clear Wireless LLC v. Bldg. Dep't of Vill. of Lynbrook*, 2012 WL 826749, at *9 (E.D.N.Y. Mar. 8, 2012) ("[I]t is not up to the FCC to construe the [Act] to say something it does not say, nor up to the Court to find broadband communication encompassed by the law." (internal quotation marks omitted)).

**B. Was the Board's denial supported by substantial evidence?**

[5]  [6]  [7]  Although the Act requires that the denial of an application to install wireless facilities be supported by substantial evidence, *see* 47 U.S.C. § 332(c)(7)(B)(iii), it does not set any substantive standards for evaluating the application; "[t]hat authority must be found in state or local law." *Willoth*, 176 F.3d at 644. Under New York law, lack of "public necessary" can justify a denial. *See Omnipoint*, 430 F.3d at 535 (citing *Consol. Edison Co. v. Hoffman*, 43 N.Y.2d 598, 611, 403 N.Y.S.2d 193, 374 N.E.2d 105 (1978)). In the context of wireless facilities, public necessary requires the provider "to demonstrate that there was a gap in cell service, and that building the proposed [facility] was more feasible than other options." *Id.*

[8]  Thus, as with the effective prohibition issue, the lack of a gap in coverage is relevant here and can constitute substantial evidence justifying denial of a permit. For the reasons stated in the previous section, there was substantial evidence justifying the Board's conclusion that there was no gap in coverage justifying ExteNet's application. And, since one reason given by the Board for its decision was supported by substantial evidence, the Court need not evaluate its other reasons. *See Town of Islip*, 893 F. Supp. 2d at 355.

**C. Was the Board's denial discriminatory?**

*5  [9]  Unlike the prior two issues, there is little caselaw as to what constitutes a discriminatory denial. Fortunately, the statutory standard is clear. As noted, the comparison must be between "providers of functionally equivalent services." 47 U.S.C. § 332(c)(7)(B)(i)(I).

ExteNet principally argues that the Village's permitting process singles out small wireless facilities and impose requirements "above and beyond those applied to any other telecommunication structure." Pls. Mem. of Law in Supp. of its Mot. for Summ. J. at 24. But it fails to identify any such structure that offers functionally equivalent services. The only other candidate in the record is a large cell tower, which, by ExteNet's own admission, does not offer the same functionality as its small wireless facilities.

ExteNet briefly argues that the Village allowed Altice USA to install small wireless facilities without prior permission, but the comparison is still not apt. Altice One is a cable provider to whom the Village was legally required to offer access to its rights-of-way. In addition, Altice USA offers cable and WiFi access; by ExteNet's own admission, these are not equivalent to the cell service provided by its small wireless facilities.

**D. Did the Board's denial violate New York law?**

[10]  Finally, ExteNet argues that the Board's denial violates § 27 of New York's Transportation Corporations Law. That statute—somewhat confusingly—governs telephone and telegraph corporations, and provides that "any such corporation may erect, construction and maintain the necessary fixtures for its lines upon, over or under any of the public roads, streets, and highways." *Id.*

Given its focus on "lines," it is far from clear that the statute applies to providers of wireless services. In any event, the statute requires that the corporation must "first obtain from ... the trustees of villages ... permission to use the streets within such ... village ... for the purposes herein set forth." *Id.* It is undisputed that ExteNet did not receive such permission.

**IV**

For the foregoing reasons, the Village's motion for summary judgment is granted and ExteNet's motion is denied.

**SO ORDERED.**

ExteNet Systems, Inc. v. Village of Flower Hill, --- F.Supp.3d ---- (2022)

**All Citations**

--- F.Supp.3d ----, 2022 WL 3019650

Footnotes

1      4G LTE stands for "fourth-generation long-term evolution," a wireless standard that improves the capacity and speed
       of a carrier's network.

End of Document                                          © 2022 Thomson Reuters. No claim to original U.S.
                                                                        Government Works.

# EXHIBIT H

continue using the network. The shutdown was completed at the end of 2022 as planned.[73][74]

## Radio frequency summary [edit]

*Further information: LTE frequency bands and 5G NR frequency bands*

The following is a list of 4G LTE and 5G NR frequency bands which Verizon employs in the United States. Verizon's CDMA network was shut down on December 31, 2022.[75]

### Frequency bands used on the Verizon Network

| Frequency Band | Band Number | Protocol | Generation | Status | Notes |
|---|---|---|---|---|---|
| 700 MHz Upper SMH C Block | 13 | | | | Primary LTE band, launched in December 2010.[76] Spectrum covers 100% of the continental United States.[77] |
| 850 MHz CLR | 5 | | | Active | Additional low-band LTE, currently being shared with 5G using DSS.[78] |
| 1.7/2.1 GHz AWS | 4/66 | LTE/LTE-A/ LTE-A Pro | 4G | | Branded as "XLTE"[79] at launch, this second layer of LTE coverage is used to increased bandwidth in major markets. |
| 1.9 GHz PCS | 2 | | | | Third layer of LTE coverage, used to relieve congestion.[80] |
| 3.5 GHz CBRS | 48 | | | | Additional capacity in select areas.[81][82] |
| 5.2 GHz U-NII | 46 | | | | |
| 850 MHz CLR | n5 | | | Active/Building Out | Branded as "5G Nationwide", these are the primary bands for 5G NR network. Spectrum is shared with LTE using DSS. Launched October 2020.[78] |
| 1.7/2.1 GHz AWS | n66 | NR | 5G | | |
| 1.9 GHz PCS | n2 | | | | |
| 3.7 GHz C-Band | n77 | | | | Branded as "5G Ultra Wideband", launched on January 19, 2022.[83] |
| 28 GHz Ka-Band | n261 | | | | Branded as "5G Ultra Wideband", these are the mmWave bands, enabling 4 gigabit speeds using small cells. Went live in May 2019. |
| 39 GHz Ka-Band | n260 | | | | |

Contents   hide

(Top)
History
> Network
  Radio frequency summary
    Past networks
Apps
> Products and services
  Wireless phone services
  Wireless home phone
  Mobile broadband and Wi-Fi
  LTE in Rural America
See also
References
External links

# EXHIBIT I

REDACTED — FOR PUBLIC INSPECTION

T-Mobile USA, Inc.

Methodology for T-Mobile Drive Tests
to Verify Compliance with T-Mobile/Sprint Merger Commitments

January 8, 2020

REDACTED - FOR PUBLIC INSPECTION

TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................. 1

II.     DRIVE TEST ROUTES .......................................................................... 2

III.    DRIVE TEST EQUIPMENT & PLAN ..................................................... 3

IV.     COVERAGE ASSUMPTIONS AND DATASETS ...................................... 7

V.      COVERED POPULATION CALCULATION ............................................ 8

VI.     SPEED TEST POPULATION CALCULATION ......................................... 9

VII.    ROADWAY AND STATIONARY MEASUREMENT LOCATION
        SELECTION ........................................................................................ 10

VIII.   MOBILE SPEED MEASUREMENT ....................................................... 11

IX.     LARGE RURAL CENSUS BLOCK METHODOLOGY ............................. 12

X.      GRID AND CENSUS BLOCK SPEED .................................................... 14

XI.     THIRD PARTY OVERSIGHT ............................................................... 15

XII.    DELIVERABLES .................................................................................. 16

REDACTED FOR PUBLIC INSPECTION

## I.    INTRODUCTION

The Commission's order approving the license transfers associated with the merger of T-Mobile US, Inc. ("T-Mobile") and Sprint Corporation adopted as conditions commitments made by the Applicants in their *ex parte* filing dated May 20, 2019.[1]  As described in the Order, one of those commitments requires T-Mobile to meet certain 5G network build-out commitments.[2]  To verify the coverage area and speeds of its 5G service to determine compliance with the build-out commitments, T-Mobile committed to conducting a drive test utilizing a methodology mutually agreed to by T-Mobile and the Wireless Telecommunications Bureau ("Bureau").[3]

This document describes the methodology agreed to by T-Mobile and the Bureau, which T-Mobile will utilize to conduct drive tests following the third and sixth anniversaries of the merger's closing.

As described herein, T-Mobile will drive dense drive routes covering populated areas and major and minor roads.  T-Mobile will drive approximately 1 million miles, more than five times the industry average (approximately 220,000), resulting in extensive testing in both urban and rural areas.

Stationary and mobile speed measurements will be taken in 500-meter grids that cover about 99.5% of the population, including 98% of the rural population.  Approximately five million speed measurements, more than ten times the industry average (approximately 500,000), will be taken at different locations and in diverse network conditions to quantify delivered speeds.  Measured data will be mapped to unique 500-meter grids in Census blocks containing population across the entire country, and the population of each Census block will be associated with the average speed across all speed-tested grids in the Census block.  Note the population reference is derived from the 2016 Pitney Bowes study, which provides population at the Census block level based on the 2010 U.S. Census but updated based on more recent information.[4]

---

[1] *Applications of T-Mobile US, Inc. and Sprint Corporation*, Memorandum Opinion and Order, Declaratory Ruling, and Order of Proposed Modification, WT Docket No. 18-197, FCC 19-103 (Nov. 5, 2019) ("Order").

[2] *Id.* at App. G, Att. 1.

[3] *Id.*

[4] *See* Letter from Nancy Victory, Counsel to T-Mobile, and Regina Keeney, Counsel to Sprint, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 18-197, at 5-6 (filed May 20, 2019).

# EXHIBIT J

Mr. and Mrs. Jeffrey Phalen
13106 Amber St
Grass Valley, CA 95949
NoToTower23@yahoo.com

775-223-1111

June 22nd, 2024

Dear Nevada County Board of Supervisors,

For the past six years we've searched high and low for a property in this county that had useable land, was in a good location for work and was within our budget. Last year we finally found (what was supposed to be) our forever home. Since owning it, we've invested thousands of hours of blood, sweat and tears into cleaning it up and bringing it back to life. We've also invested over $300,000 in remodeling it and clearing the land.

Our long-term goal for this land is to turn it into a place where troubled kids can come and find hope, love, healing and FUN! We currently have seven animals that we use for animal therapy. When kids come to ride our pony, we use the track we made around our front pasture for their lessons. Unfortunately, this is the same place PG&E plans to trench and install underground cables to power the 129-foot cell tower that will LOOM over us. When we bought this land, I never imagined riding, playing and spending time with my kids and other children in the shadow of a massive cell tower. Since we are located directly across the street from the proposed site and our home sits atop a hill, this tower will be the main focal point from over 90% of our property.

When I am making breakfast and doing dishes in the morning, I will look out my kitchen window at a huge structure that dominates the skyline. When we are eating dinner at night in the dining room our sole view will be one of a cell tower. When I am walking out our dogs, gardening in our front and back yard, or doing anything on our property this tower will command attention as it will stand 40-50 feet ABOVE the tree line and only 500 feet from my fence-line. When we are on the back porch barbequing and hosting friends and family, our main line of sight will also be towards this massive tower.

Due to the proximity of the tower and the impact it will have on our views, our agent estimates our property will lose 33% of its value and take 2-3 times longer to sell. We estimate our home and land will be worth well over a million dollars when we are finished but if this tower is built it will rob us of the $300k we've invested and more!

We, along with 76 other neighbors, are vehemently against this tower. All of us have cell reception and great internet here. The only neighbor who wants this is the one who is profiting from it. What's worse is that we all have to stare at it but she'll never have to look at it because it will be behind her house and up the hill. We as a neighborhood have offered to buy her Starlink AND pay for her attorney fees to break the contract with Verizon but she refuses to budge. PLEASE HELP US keep this area beautiful, rural and valuable by stopping this tower! Thank you!

Kristin Phalen                                    Jeffrey Phalen

Ashley Permenter

20962 Dog Bar Road

Grass Valley ca 95949

To The Nevada County Board of Supervisors,

Our home is the closest to the proposed tower site. To say that this massive 129 foot tower will be an eye sore is severely understated. In fact, it will be the only thing we see because it will be built about 100 feet from our home. If this happens, it will completely dwarf the other trees surrounding it and DOMINATE our entire view. Verizon also says they won't be cutting anything down to accomplish this endeavor but in that area, standing on my property line, I can see where it's meant to go and with the over growth of the side road and the trees there's no way this can be accomplished as the property stands.

If this goes through it would be as if I'm living next to a prison. With their security fence and concrete pad I would no longer be able to sell this property as "rural" because of the defensible space this structure is meant to have. The construction of this tower would also promote hoodlumism. During construction anyone could come and steal anything from the site and what's to say that my house and belongings would be safe as we'd be roughly 100ft from the tower! There are children that live on our property and their safety is paramount! There are three generations of people who live here and we collectively asking you to stop this tower!

Thank you for your time.

Ashley Permenter

Bruce A. Roush                                                                    June 23, 2024
20791 Dog Bar Rd.
Grass Valley, CA 95949


Dear Nevada County Board of Supervisors,

I want to formally request you to stop the Verizon Dog Bar Road cell tower from going in at 20896 Dog
Bar Road, Grass Valley, CA 95949. This property is across Dog Bar Road catacorner from my property. I
was motivated to purchase my property back in 2012 because of the beautiful view out my back patio
slider window and the other window from my great room as well as from the back patio. The original
owner positioned the back of the home facing Dog Bar to be at a slight angle to take full advantage of
this view.

The tower's height of 129 feet will be way above the surrounding trees and will ruin this beautiful view.
The tower's height will make it a focal point for my eyes whenever I look out my back windows. If this
cell tower goes in, I will have to look at it every day, and every hour I'm home for the rest of my life.

I am also in the beginning stages of a remodel that will enlarge my back windows and moving my
kitchen. As you can imagine this cell tower is very distressing to me given my main motivation for my
remodel is to take advantage of the beautiful view from my back windows. Also, my financial investment
will be negatively impacted by the cell tower.

Respectfully,

Bruce A. Roush

**MIKE & JANET BRISSON**
**20693 DOG BAR ROAD, GRASS VALLEY, CA 95949**
**530-913-2724  rubes@countryrubes.com**

June 22, 2024

Nevada County Planning Department
950 Maidu Avenue, Suite 170
PO Box 599002
Nevada City, CA 95959-7902

I would like to express my disagreement with the Verizon Tower that is being planned to be installed at 20896 Dog Bar Road.

This property less than 1000' from our property and since we live on a hill with our front door overlooking that property in clear sight of our whole front of our property where I spend most of our days outside working on our farm, I find this quite distressful that I will now have an ugly artificial tree soaring over 120 ' into our skyline, destroying our pastoral view that we have enjoyed for over 30 years.

The thought of having this enormous tower destroying our view from our living room, dining room, kitchen, master bedroom and two of our upstairs bedrooms is very emotionally upsetting.

Not to mention how much this is going to reduce the value of our property. When we were first looking at property 35 years ago, our agent was very determined to not show us properties that had electrical towers nearby.  Our Agent's name was Margie Weeks, who had told us at the time, 'no one wants to live near these towers and although you can get them below market value, they would not appreciate in price very much.' I am sure this will apply to Verizon towers has about ½ the population feel they contribute to health problems, just like those electrical towers.

Finally, we are Verizon customers, have been for over 23 years and have always gotten wonderful cell and internet reception here.  Having another tower here would be redundant and unnecessary.

Please let me know what I can do to prevent this tower from going in our neighborhood.

Sincerely,

Janet Brisson

Dira Krecek

20962 Dog Bar Road Grassy Valley, CA 95949

(916)600-4838

To the Nevada County Board of Supervisors,

My name is Dira and I live at 20962 Dog Bar Road, our property shares the southern fence line with the proposed cell tower parcel. I am asking that you deny the placement of this tower, which will be closer and more visible from my own house than the parcel owners house, as the tower would sit atop the same hill that my residence sits.

We bought this property 2 years ago after selling our house in Sacramento County. We wanted a place where we could continue to raise our four children away from the city, in a better school district, and where they would have room to move and grow and enjoy the nature surrounding us. I wanted them to have what my sister and I had growing up in Placerville.

Had we known then that this tower would potentially be placed or if one had already been there, then we would not have purchased this property. That, coupled with the resounding negative feedback from the neighborhood makes me fear for the value of my property. Especially since ours is the one that will be in the shadow of this 129 foot tower.

I have read through the proposal, looked at all of the simulation pictures and layout maps, and attended the meeting. I question the validity of their numbers regarding the noise level of the generator and the proximity of the 900 square foot lease and access road from my property line. All of which will be visible from my driveway where my children love to play and my back deck where we lounge and get to enjoy the amazing views of the mountain range, the trees, and the deer that love to come through.

This tower would potentially ruin everything we have worked so hard for. I have Verizon as my cell phone carrier and we have had no issues. There has to be a better place to build this tower that's not in the middle of a neighborhood where it is not wanted and would ruin the beautiful views and natural surroundings. Please do not allow this tower to go in.

Kind regards,

Dira Krecek

**June 23rd, 2024**

**Re:** Aesthetics of proposed cell tower at 20896 Dog Bar Rd, Grass Valley

**From:** Gregory & Linnie McNaughton, owners of 21055 Dog Bar Rd, and Kienan Parr & Laura McNaughton, residents at same address

To the Nevada County Board of Supervisors,

We are writing to express our deep concern and displeasure with the proposed construction of a cell phone tower at the 20896 Dog Bar Rd, which sits caddy corner to our residence. The aesthetic of this proposed tower will take away from the picturesque beauty of the valley we live on the slope of and enjoy the sight of everyday.

First, the applicant's presentation shows the tower imposed on the hill from the valley bottom's perspective only. This is misleading as the surrounding trees give the false sense that the tower will not stick, or pop out more than it really will. Essentially, forced perspective was used to make the tower not seem as dominating as it truly will be. The *real* view of the tower will be blunt from our property and our neighbors' whom sit almost to or level with the base of the tower. The top of this structure will tower high above the surrounding trees and loom over us as a continual reminder of its artificial presence.

Furthermore, I, Kienan Parr have a lot of skepticism about the estimated surrounding tree heights averaging 90 feet. For my daily job I climb three to four trees ranging in height from 30-150 feet and the estimation of these heights is important both for my personal safety and the equipment I'm installing in them. During the public hearing and applicant's presentation on June 12th at the Rood Center, I asked the applicant what method was employed to estimate the height of the surrounding trees? This should have been a clear and concise answer but the response simply was "a certified surveying company estimated the tree height and surveyed the land." This answered the unasked "who", and didn't answer my "what." Clearly the answer didn't instill confidence and leads me to believe the heights was overestimated.

If I were to put a maximum height on the surrounding trees where the proposed tower is to be built, I would put it at 80 feet. At 129 feet height when built, this would have the tower dominating the western skyline at nearly 50 feet above everything else. Unlike an ancient tree, this will be unnatural and imposing.

As owners of this property, this greatly concerns us as to what will be taken away from us daily, and the long-term effects this will have on the equity of our home. For these reasons, we strongly encourage this body to deny this permit and <u>not</u> allow the construction of the cell tower at 20896 Dog Bar Rd. Thank you for your time.

Gregory McNaughton,   Linnie McNaughton,   Laura McNaughton,   Kienan Parr

June 23, 2024

Nevada County Board of Supervisors

950 Maidu Avenue Suite 170

Nevada City, CA 95959

Project: Proposed Verizon Wireless Communication Tower

To the Board of Supervisors,

My property is directly across from the parcel where you are planning to place this communication tower. My son, our dogs and I enjoying walking down to the end of our property by Dog Bar Rd and relax in some lounge chair and wave hello to friends, neighbors and family when they drive by. As tall as this proposed tower is to be, not only will it be an eye sore, but it will make our rest place more uncomfortable and less attractive.

I am in my seventies and my son is suffering from a mental health illness. This rest stop is helpful for both of us and a space for the dogs to run. My late husband and I used to rescue St. Bernards. We had over 25 rescued dogs through the past 28 years we/I have lived here. All of them loved their walk on the property down to Dog Bar Road. The noise associated with this tower, especially when the power goes out will affect our dogs. As you probably know, a dogs hearing is much more acute than a human being. We really don't need something that will start them barking and howling or damaging their ears or affecting their behavior.

Since we have had fires in our area, the Bear River fire approximately four years ago, this is an area in risk of potential fires. With storage of fuel and batteries in the tower area that gives homeowners here like myself grave concern. Also being attached to a PG&E pole on Dog Bar give concerns of sufficient electric usage and up keep. Something PG&E is noted to be lax on.

With all this in mind it is my request that you revisit the idea of erecting this tower at the proposed location, look over Verizon's survey with more scrutiny and dismissed this as a viable location. The neighboring community I,ncluding myself and son, do not want this communication tower here.

Respectfully.

Sandra Mallory

530-346-7088

# EXHIBIT K





PROPOSED MONOPINE









PROPOSED MONOPINE





PROPOSED MONOPINE

# EXHIBIT L



June 24, 2024

I have been a real estate franchise owner and licensed real estate broker in the Nevada County area for 38 years.  In my experience, the majority of the buyers that relocate to this area move to achieve the peace and serenity of moving from the fast-paced city life to their own little bit of country life.  While appreciating the modern conveniences of having reliable cell and internet services, the main objective of their move is to enjoy their views and environment, without the impact of cell and electrical towers.

In my opinion, prospective buyers are concerned about the proximity of a property to cell towers that obstruct and impact views and the neighborhood. A cell tower will make the homes far less marketable. It will be difficult to find a purchaser willing to buy a home with a cell tower close to their property as it is unsightly and detracts from beauty.  It will take longer to sell the house and such sales are at lower prices than homes not located near transmission equipment.

Based on my experience, the placement of a cellular transmission tower in a rural neighborhood will substantially decrease the value of the home located at 10962 Dog Bar from 20 to 25% as compared to properties that are not impacted by a cell tower and because the tower location is approximately 100 to 200 ft from the house

Sincerely,



## Laura Berman

Broker Associate  00934015
Nick Sadek Sotheby's International Realty
Laura@GvRealEstate.com

530-913-8789
www.GvRealEstate.com
226 Mill Street
Grass Valley, Ca. 95949





June 24, 2024

I have been a real estate franchise owner and licensed real estate broker in the Nevada County area for 38 years.  In my experience, the majority of the buyers that relocate to this area move to achieve the peace and serenity of moving from the fast-paced city life to their own little bit of country life.  While appreciating the modern conveniences of having reliable cell and internet services, the main objective of their move is to enjoy their views and environment, without the impact of cell and electrical towers. In my opinion, prospective buyers are concerned about the proximity of a property to cell towers that obstruct and impact views and the neighborhood. A cell tower will make the homes far less marketable. It will be difficult to find a purchaser willing to buy a home with a cell tower close to their property as it is unsightly and detracts from beauty.  It will take longer to sell the house and such sales are at lower prices than homes not located near transmission equipment.

Based on my experience, the placement of a cellular transmission tower in a rural neighborhood will substantially decrease the value of the home located at 21055 Dog Bar from 10 to 15% as compared to properties that are not impacted by a cell tower.

Sincerely,



## Laura Berman

Broker Associate 00934015
Nick Sadek Sotheby's International Realty
Laura@GvRealEstate.com

530-913-8789
www. GvRealEstate.com
226 Mill Street
Grass Valley. Ca. 95949

Nick Sadek | Sotheby's
INTERNATIONAL REALTY



June 24, 2024

I have been a real estate franchise owner and licensed real estate broker in the Nevada County area for 38 years.  In my experience, the majority of the buyers that relocate to this area move to achieve the peace and serenity of moving from the fast-paced city life to their own little bit of country life.  While appreciating the modern conveniences of having reliable cell and internet services, the main objective of their move is to enjoy their views and environment, without the impact of cell and electrical towers. In my opinion, prospective buyers are concerned about the proximity of a property to cell towers that obstruct and impact views and the neighborhood. A cell tower will make the homes far less marketable. It will be difficult to find a purchaser willing to buy a home with a cell tower close to their property as it is unsightly and detracts from beauty.  It will take longer to sell the house and such sales are at lower prices than homes not located near transmission equipment.

Based on my experience, the placement of a cellular transmission tower in a rural neighborhood will substantially decrease the value of the home located at 12060 Amber from 10 to 15% as compared to properties that are not impacted by a cell tower.

Sincerely,



## Laura Berman

Broker Associate 00934015
Nick Sadek Sotheby's International Realty
Laura@GvRealEstate.com

530-913-8789
www. GvRealEstate.com
226 Mill Street
Grass Valley, Ca. 95949

Nick Sadek | Sotheby's
INTERNATIONAL REALTY



June 24, 2024

I have been a real estate franchise owner and licensed real estate broker in the Nevada County area for 38 years. In my experience, the majority of the buyers that relocate to this area move to achieve the peace and serenity of moving from the fast-paced city life to their own little bit of country life. While appreciating the modern conveniences of having reliable cell and internet services, the main objective of their move is to enjoy their views and environment, without the impact of cell and electrical towers.

In my opinion, prospective buyers are concerned about the proximity of a property to cell towers that obstruct and impact views and the neighborhood. A cell tower will make the homes far less marketable. It will be difficult to find a purchaser willing to buy a home with a cell tower close to their property as it is unsightly and detracts from beauty. It will take longer to sell the house and such sales are at lower prices than homes not located near transmission equipment.

Based on my experience, the placement of a cellular transmission tower in a rural neighborhood will substantially decrease the value of the home located at 120793 Dog Bar from 10 to 15% as compared to properties that are not impacted by a cell tower.

Sincerely,



## Laura Berman

Broker Associate 00934015
Nick Sadek Sotheby's International Realty
Laura@GvRealEstate.com

530-913-8789
www. GvRealEstate.com
226 Mill Street
Grass Valley. Ca. 95949

Nick Sadek | **Sotheby's**
INTERNATIONAL REALTY



June 24, 2024

I have been a real estate franchise owner and licensed real estate broker in the Nevada County area for 38 years.  In my experience, the majority of the buyers that relocate to this area move to achieve the peace and serenity of moving from the fast-paced city life to their own little bit of country life.  While appreciating the modern conveniences of having reliable cell and internet services, the main objective of their move is to enjoy their views and environment, without the impact of cell and electrical towers.

In my opinion, prospective buyers are concerned about the proximity of a property to cell towers that obstruct and impact views and the neighborhood. A cell tower will make the homes far less marketable. It will be difficult to find a purchaser willing to buy a home with a cell tower close to their property as it is unsightly and detracts from beauty.  It will take longer to sell the house and such sales are at lower prices than homes not located near transmission equipment.

Based on my experience, the placement of a cellular transmission tower in a rural neighborhood will substantially decrease the value of the home located at 1306 Amber St. from 10 to 15% as compared to properties that are not impacted by a cell tower.

Sincerely,



## Laura Berman

Broker Associate  00934015
Nick Sadek Sotheby's International Realty
Laura@GvRealEstate.com

530-913-8789
www. GvRealEstate.com
226 Mill Street
Grass Valley, Ca. 95949





June 24, 2024

I have been a real estate franchise owner and licensed real estate broker in the Nevada County area for 38 years. In my experience, the majority of the buyers that relocate to this area move to achieve the peace and serenity of moving from the fast-paced city life to their own little bit of country life. While appreciating the modern conveniences of having reliable cell and internet services, the main objective of their move is to enjoy their views and environment, without the impact of cell and electrical towers.

In my opinion, prospective buyers are concerned about the proximity of a property to cell towers that obstruct and impact views and the neighborhood. A cell tower will make the homes far less marketable. It will be difficult to find a purchaser willing to buy a home with a cell tower close to their property as it is unsightly and detracts from beauty. It will take longer to sell the house and such sales are at lower prices than homes not located near transmission equipment.

Based on my experience, the placement of a cellular transmission tower in a rural neighborhood will substantially decrease the value of the home located at 120791 Dog Bar from 10 to 15% as compared to properties that are not impacted by a cell tower.

Sincerely,



## Laura Berman

Broker Associate 00934015
Nick Sadek Sotheby's International Realty
Laura@GvRealEstate.com

530-913-8789
www. GvRealEstate.com
226 Mill Street
Grass Valley, Ca. 95949





**530-268-1868**
**Fax: 530-268-2173**

**AFFORDABLE**
REAL ESTATE LOANS
*Your Local Lender Since 1991*

Email:
*staff@affordablerealestateloans.com*
Website:
*affordablerealestateloans.com*

I have been a licensed real estate broker in California for over 30 years and have immense knowledge in the Nevada/Placer County area. I have also been a mortgage loan professional for the same number of years. As a real estate broker and loan officer, I see many appraisals that determine the valuations of properties and the factors that go into these values.

In my professional opinion, the installation of the proposed 13-story cell phone tower will reduce the value of the nearby homes on Dog Bar and Amber Ct by approximately twenty to twenty-five percent. Not only the reduction of price, but it would also hinder the future marketability of the property.

Should you have any questions or require additional information, please feel free to contact me.

*Cindy R. Kolari*

Cindy Kolari
*staff@affordablerealestateloans.com*
*530-268-1868*
*NMLS #: 321606*
*DRE #: C6930756*

# EXHIBIT M

Ashley Permenter

20962 Dog Bar Road

Grass Valley ca 95949

To The Nevada County Board of Supervisors,

Our home is the closest to the proposed tower site. To say that this massive 129 foot tower will be an eye sore is severely understated. In fact, it will be the only thing we see because it will be built about 100 feet from our home. If this happens, it will completely dwarf the other trees surrounding it and DOMINATE our entire view. Verizon also says they won't be cutting anything down to accomplish this endeavor but in that area, standing on my property line, I can see where it's meant to go and with the over growth of the side road and the trees there's no way this can be accomplished as the property stands.

If this goes through it would be as if I'm living next to a prison. With their security fence and concrete pad I would no longer be able to sell this property as "rural" because of the defensible space this structure is meant to have. The construction of this tower would also promote hoodlumism. During construction anyone could come and steal anything from the site and what's to say that my house and belongings would be safe as we'd be roughly 100ft from the tower! There are children that live on our property and their safety is paramount! There are three generations of people who live here and we collectively asking you to stop this tower!

Thank you for your time.

Ashley Permenter

# EXHIBIT N

# FIREHOUSE

LOGIN   JOIN

HOME

# Oswego, New York Cellular Tower Crushes Chief's Vehicle

Within a matter of seconds Thursday morning, the cellular tower behind the Oswego Fire Department's eastside station went from being 165 feet tall to being 165 feet long.

Nov. 14, 2003   💬

This website uses cookies to enhance your browsing experience and serve personalized content.   **Privacy Policy**

Accept All

Case 2:25-cv-01932-WBS-SCR    Document 16-1    Filed 10/03/25    Page 94 of 122



View Image Gallery

It stretched for more than half the length of a football field, causing considerable damage but no injuries.

Within a matter of seconds Thursday morning, the cellular tower behind the Oswego Fire Department's eastside station went from being 165 feet tall to being 165 feet long.

Winds, in excess of 55 mph toppled the tower in an easterly direction; the fire chief's

This website uses cookies to enhance your browsing experience and serve personalized content. **Privacy Policy**





HOME

# Oswego, New York Cellular Tower Crushes Chief's Vehicle

Within a matter of seconds Thursday morning, the cellular tower behind the Oswego Fire Department's eastside station went from being 165 feet tall to being 165 feet long.

It stretched for more than half the length of a football field, causing considerable damage but no injuries.

Within a matter of seconds Thursday morning, the cellular tower behind the Oswego Fire Department's eastside station went from being 165 feet tall to being 165 feet long.

Winds, in excess of 55 mph toppled the tower in an easterly direction; the fire chief's vehicle and a section of a fence were crushed.

There were no injuries, Chief Ed Geers reported.

Firefighters quickly cut off the power to the tower, Deputy Chief Mark McManus added. "Nobody got hurt, but it got the adrenaline pumping," he said.

The tower fell in the best possible spot, the chief said.

"It went east, across our back parking area and the top landed between two parked cars. As upset as I am that it fell on my vehicle, I am extremely glad that no one was hurt," Geers said.

If the tower went down in just about any other direction it could have crushed the firefighters' museum or it could have fallen on a large part of the fire station itself; if so, several people would have been injured and quite possibly killed, the chief added.

If the tower had gone to the west it would have crossed the entrance way to the Price Chopper grocery store's parking lot.

Cars go in and out of there frequently during the day, the chief said. Someone surely would have been killed or badly injured if the tower went that way, he said.

Firefighters said the tower collapse sounded like a large steel door being slammed shut.

"When I came to work today, this wasn't even on the top 200 list of things I thought might happen," McManus said.

A group of firefighters were in the office just before 11:05 a.m. when the tower went down, McManus said. The wind had picked up and sounded like a train, he said.

"We say a piece of roofing blow away," he said. "No one expected the tower to come down."

Firefighter Tom Smith "saw" the tower fall.

"I caught a glimpse of it going past the window out of the corner of my eye. I didn't really know what it was. I thought it was something off the roof," he said. "Then we heard the crash, and prayed no one got hurt."

The sound was hard to describe, McManus said. "It was almost like a large metal door slamming," he said.

"Maybe because of the noise the wind was making it muffled it in here," the chief added.

The top of the tower encroached about 10 to 15 feet onto the back yard of the Ford residence on East Fourth Street, damaging a small storage area.

No one was home at the time.

However, Lori Ford was at work - at Cakes Galore and More - just around the corner.

"It sounded like thunder, like the roof was coming off," explained Bob Bateman, owner of Cakes Galore. "We thought the roof of the business had blown off."

However, when they went out to look a passing motorist caught their attention as he gestured toward the fire station, Ford said.

"Everybody got lucky. It could have been worse," Bateman said. "It's lucky that it didn't hit the firefighters' museum, they have some rare antiques over there."

The tower made a big boom when it hit the ground they said.

"It was scary," Bateman admitted.

"We both jumped. It sounded like thunder, the worst thunder you could ever imagine. We didn't know what had happened," Ford added. "I looked to see what it had done to my back yard. It had a ways to go before it would have hit the house, but I was still like, 'oh, my God!'"

A piece of the tower's antenna remained lodged near the top of a tree in the Fords' back yard on Thursday afternoon.

Wind speeds were an estimated 55 to 60 mph about the time the tower fell. Wind speeds reached 85 mph shortly after noon.

The winds were in the 25 to 45 mph for most of the day, according to Bill Gregway, local observer for the National Weather Service.

There were a few times during the day the speeds jumped up to 55 to 60 mph, he noted.

On the west side of the city Thursday the winds rolled up a large section of the tin roof on Stone's Candies shop.

It sounded like someone was banging on the roof with a hammer, workers inside the store said.

A few more miles to the west a large pine tree was ripped apart by the wind and part of it fell on a garage along Route 104 in the Town of Oswego.

The winds also knocked out the sports dome on Route 481. Portions of the inflatable roof were pierced by the basketball backboards and other sports equipment.

All sorts of debris were being blown across city streets all day and evening.

Niagara Mohawk reports more than 8,000 Central New York customers are without power, roughly 3,000 of them in areas of Oswego County.

A rash of motor vehicle accidents, believed to be weather related, were reported around the county. One accident, on Route 264 in Schroeppel, killed a pregnant woman.

**Source URL:** https://www.firehouse.com/home/news/10530193/oswego-new-york-cellular-tower-crushes-chiefs-vehicle

# EXHIBIT O



April 2022,

https://www.fox5vegas.com/video/2022/04/26/cellphone-tower-collapses-near-tropicana-nellis/









# EXHIBIT P





January 2009,

https://www.google.com/search?q=wellesly+cell+tower+fire&sca_esv=9f9a5c109fb2290a&sca_upv=1&biw=1280&bih=8
55&tbm=vid&ei=mGsaZv3zFZO8ptQPsaKkoAQ&ved=0ahUKEwj9n5aiir-
FAxUTnokEHTERCUQ4MhDh1QMIDg&uact=5&oq=wellesly+cell+tower+fire&gs_lp=Eg1nd3Mtd2l6LXZpZGVvIhh3ZWxsZX
NseSBjZWxsIHRvd2VyIGZpcmUyCBAAGlAEGKIEMggQABiJBRiiBEiTHlDOBVihHHAAeACQAQCYAYABoAHXCKoBAzEuObgBA8
gBAPgBAZgCCaAC7QfCAgoQABiABBiKBRhDwgIGEAAYBxgewgIFEAAYgATCAgQQABgewgIGEAAYBxgeGA3CAggQABglGB4YDclCCBAhGKABGMMEwgIKECEYChigARjDBJgDAIgG
AZIHAzAuOaAH-ik&sclient=gws-wiz-video#fpstate=ive&vld=cid:d396e57c,vid:0cT5cXuyiYY,st:0

EXHIBIT Q





September 29, 2023,

https://www.google.com/search?q=cell+tower+fire&oq=cell+tower+fire&gs_lcrp=EgZjaHJvbWUyBggAEEUYOTIHCAEQABi
ABDIHCAIQABiABDIICAMQABgWGB4yCAgEEAAYFhgeMgglBRAAGBYYHjIICAYQABgWGB4yCAgHEAAYFhgeMgoICBAAGA8Y
FhgeMg0ICRAAGIYDGIAEGIoF0gEJMjU5OGowajE1qAIIsAIB&sourceid=chrome&ie=UTF-
8#fpstate=ive&vld=cid:1d831976,vid:IPK-GyPP4kM,st:0





July 14, 2022,
https://www.google.com/search?q=cell+tower+fire&oq=cell+tower+fire&gs_lcrp=EgZjaHJvbWUqDggAEEUYOxhDGIAEGI
oFMg4IABBFGDsYQxiABBiKBTIHCAEQABiABDIICAIQABgWGB4yCAgDEAAYFhgeMggIBBAAGBYYHjIICAUQABgWGB4yCAgG
EAAYFhgeMgoIBxAAGA8YARgeMggIBxAAGA8YARgeMgoICBAAGIDAGIAEGIoFMg0ICRAAGIDAGIAEGIoF0gEJMzUxMGowajE1qAIIsAIB&sourceid
=chrome&ie=UTF-8#fpstate=ive&vld=cid:724bbb71,vid:YMcRdXRXCfY,st:0





2021,

https://www.google.com/search?q=cell+tower+fire&sca_esv=9f9a5c109fb2290a&sca_upv=1&tbm=vid&ei=m2caZtXNM
off5NoPn5yi6A0&start=10&sa=N&ved=2ahUKEwiVh8a7hr-FAxWHL1kFHR-
OCN0Q8tMDegQIBRAE&biw=1280&bih=855&dpr=1#fpstate=ive&vld=cid:4692ab50,vid:7EN3Z4C8550,st:0



June 2020,

https://richmond.com/cell-tower-in-hanover-destroyed-by-fire/video_ff33266b-b432-5c2f-9a39-ec1e22828095.html



2018,

https://www.google.com/search?sca_esv=9f9a5c109fb2290a&sca_upv=1&tbm=vid&q=cell+tower+fire&sa=X&ved=2ahU
KEwjl3eeIhb-
FAxXokIkEHZYyDtYQ8ccDegQIDBAH&cshid=1713006308123565&biw=1280&bih=855&dpr=1#fpstate=ive&vld=cid:acd69
3ea,vid:PqjLYmGLK1g,st:0



2015,

https://www.google.com/search?q=cell+tower+fire&sca_esv=9f9a5c109fb2290a&sca_upv=1&tbm=vid&ei=m2caZtXNM
off5NoPn5yi6A0&start=10&sa=N&ved=2ahUKEwiVh8a7hr-FAxWHL1kFHR-
OCN0Q8tMDegQIBRAE&biw=1280&bih=855&dpr=1#fpstate=ive&vld=cid:efe38007,vid:RjZLm5k0jO0,st:0



Montgomery MD June 2015



Newport, VA 2015



Greenville, TN November 2014



Philadelphia, PA, June 2013





June 22, 2013,

https://www.google.com/search?sca_esv=9f9a5c109fb2290a&sca_upv=1&tbm=vid&q=cell+tower+fire&sa=X&ved=2ahU
KEwjI3eeIhb-
FAxXokIkEHZYyDtYQ8ccDegQIDBAH&cshid=1713006308123565&biw=1280&bih=855&dpr=1#fpstate=ive&vld=cid:ce9c6
935,vid:innSl0ePkwE,st:0



2013,

https://www.google.com/search?q=cell+tower+fire&sca_esv=9f9a5c109fb2290a&sca_upv=1&tbm=vid&ei=m2caZtXNM off5NoPn5yi6A0&start=10&sa=N&ved=2ahUKEwiVh8a7hr-FAxWHL1kFHR-OCN0Q8tMDegQIBRAE&biw=1280&bih=855&dpr=1#fpstate=ive&vld=cid:34768208,vid:oP6JFjiIM9I,st:0



2013,

https://www.google.com/search?q=cell+tower+fire&sca_esv=9f9a5c109fb2290a&sca_upv=1&tbm=vid&ei=m2caZtXNM off5NoPn5yi6A0&start=10&sa=N&ved=2ahUKEwiVh8a7hr-FAxWHL1kFHR- OCN0Q8tMDegQIBRAE&biw=1280&bih=855&dpr=1#fpstate=ive&vld=cid:d44bb7cc,vid:KaTQvgc1ykE,st:0



Lilburn, GA December 2011